## Commonwealth v. Ozenbaugh

*Kevin Koss,* for prosecutrix.
*Michael Hanna,* for defendant.

SWEET, *P.J.,* June 26, 1981—Wayne T. Ozenbaugh of Rea, Washington County, Pa., and Brenda J. Hockenberry of Emporium, Cameron County, Pa., lived together much of the time while her marriage to Sam Hockenberry was valid and subsisting. Mr. Ozenbaugh went up to Sinnemahoning, Crawford County, and spent a three-day winter idyll with her the first weekend of February, 1980. At this occasion Amanda was conceived; Amanda was born on October 26, 1980, 266 days later.

When Mr. Ozenbaugh learned that Brenda was pregnant he paid $20 for her to go to the doctor. He gave her one $50 payment, apparently towards support, about a month after the child was born. He went to a wedding of some mutual friend with Brenda when she was four months pregnant and

they posed together for a seemingly friendly photograph, which is in evidence. He visited the child. He wrote to her. (A few quotes from his letter are in evidence, by agreement of counsel, and set forth in the margin.)[1] They were living together here in Washington County for much of 1979, which is admitted, almost proclaimed, by defendant. That and the weekend date at Sinnemahoning and various other incidents of keeping company at the relevant periods are corroborated by Brenda's mother, Doris Stewart. Most of all, he acknowledged paternity formally.[2]

There doesn't seem to be anything wrong with this as an ordinary bastardy case, except for two things. Throughout the period from December, 1979 to April, 1980, when this child could likely have been conceived, Brenda was living in Cameron County only seven miles from her husband, Sam Hockenberry. When she was brought to bed for her confinement, he paid the bill (somewhat involuntarily) through fringe benefits, in the amount of $3,300. There is no specific evidence of access by

---

1. Excerpts of letter from Wayne T. Ozenbaugh to Brenda Hockenberry, dated February 5, 1981: "When I am convinced, if you feel she is too much of a burden, I will take her and raise her, if that is what you want. . . Amanda is a very beautiful baby and I only wish she could have been born under happier circumstances.

"I realize the added burden that you and the baby have placed on your mother and dad. I wish I could afford to get you an apartment in town so that they would not have to carry this added responsibility but I'm not able to do that right now . . . I worried about you and about what would happen to you and the baby. It prays (sic) on my mind because I can't do more for you, but I intend to do more as soon as I am sure Amanda is my daughter."

2. Wayne T. Ozenbaugh formally signed acknowledgment of Paternity on February 18, 1981.

the husband and such is specifically denied by the prosecutrix and her mother. Under presently recognized standards, is this enough upon which to base a support order against Mr. Ozenbaugh?

I asked for briefs from counsel and they seemed to agree that Burston v. Dodson, 257 Pa. Superior Ct. 1, 390 A. 2d 216 (1978), is leading and controlling. This five to two decision says that, in headnote p. 2: "Statute did not permit trial court to rely on husband's failure to submit to blood tests in determining [this] child's paternity . . . since husband had possible access to his wife. . . ."

In the Burston case, supra, Judge Spaeth bottoms the holding on Cairgle v. American Radiator and Standard Sanitary Corp., 366 Pa. 249, 256, 77 A. 2d 439 (1951). He goes to some considerable trouble to phrase the rule as follows, at p. 11: "In order to successfully rebut the presumption of legitimacy, the evidence of non-access or lack of sexual intercourse must be clear, direct, and convincing and unanswerable [citations], although it is not necesary that the possibility of access be completely excluded " Paragraph number 5 of the headnote at p. 3 says this:

"Presumption of legitimacy of child will not survive a challenge simply because some evidence of access to child's mother is offered; if fact finder believes evidence of access, presumption of legitimacy becomes irrefutable, but if, however, fact finder does not believe evidence of access, even though evidence is uncontradicted, presumption of legitimacy is susceptible to attack, and if evidence of illegitimacy is of 'overwhelming weight,' it will be found sufficient to overcome and rebut presumption of legitimacy."

This is spelled here at some length because I

want to make it clear that I'm not relying on Ozenbaugh's failure to demand a blood test. The parties are lined up differently from their posture in Burston v. Dodson where the illegitimate child's actual father sought custody and the mother's husband was opposing it through the child's maternal grandmother. Thus, much that was said in Burston is inapposite here.

It would seem however, that when the mother of an illegitimate child is married to someone other than the man from whom she seeks support, in order for the moher to succeed in imposing a support order on the paramour, the evidence of paternity must be at the very least, "clear and convincing" although perhaps she is not held to the rigid standard of "clear, precise and indubitable." However, this is just playing with words. We should always feel some degree of moral certainty that the man on whom we impose a duty to support a child for a period of 18 years is in truth and fact, the father. He should not be merely the darkest of a bunch of black sheep.

If Brenda Hockenberry, based on these facts, sought support from Sam Hockenberry, it would have been denied. So that a reviewing court will have an easy handle on this, what I am holding in this case is that a paramour who has had sexual intercourse with the mother at the right time, who has completed a formal acknowledgement of paternity, who has paid money towards the support of this child and who has no evidence that anyone else is the father,[3] has not successfully defended an

---

3. Mr Hockenberry's presence in Cameron County is a circumstance, but it is not evidence of access. His payment of lying-in expense under a fringe benefit program is not an admission and hence not evidentiary as to paternity.

action in bastardy. Ozenbaugh's letter, his posing for the picture, his extended prior courtship of Brenda Hockenberry, are all circumstances which makes it more easy to reach this.

While water has been running under the bridges since Cairgle in 1951 and even since Burston, five years ago, the social habits of the American people have been changing. Although it is difficult to quantify the evidence, frequent newspaper and magazine articles indicate that perhaps as many as 3,000,000 American couples are living in continuing conjugal, nonmarital relationships. In at least one city, the number of illegitimate births exceed the number of legitimate births.[4] The decriminalization of fornication and adultery by the legislature has apparently made these practices less legally risky, although still meriting ecclesiastical condemnation. The Kinsey and Hite reports, although these were not in evidence in our case, are so much a part of the current culture that I may be forgiven for accepting their dictum that sex outside marriage has no longer the status of an extraodinary event. "Clark Vincent has reported a study of extramarital pregnancy in which about 10 percent of the women had been impregnated by someone other than their husbands."[5] All these

---

4. Community Services of Pennsylvania's Poverty in Pennsylvania, (3d Ed. January, 1979, 56, Table E) shows that in 1977 in the city of Harrisburg, 50.7% of the live births were illegitimate, nor is this aberrational: Chester had 48.3%, Philadelphia had 38.0% and York had 33.1%.

5. Clark E. Vincent, Sexual and Marital Health (New York, McGraw-Hill 1973, 239) as found in Rebecca M. Smith, Kleimer's Marriage and Family Relationships (2 ed., New York, Harper & Row, 1975, 299).

things being true, the presumption of legitimacy should not be given the weight it had, in an ascetic, feudal society with an established church and stable standard of morality.

I think today a judge would be considered to have a cold heart and a sterile mind if he used the medieval presumption of legitimacy as a reason to deny a baby support from his father. The law cannot be in the vanguard of social change, but when social change has taken place, the law cannot ignore it. Although laws are a reflection of cultural attitudes at the time of writing they do not seem to be rewritten as quickly as attitudes change. Laws concerning sexual activity are among the slowest to change. Legal changes from regulation of sexual activity even with marriage to allowing any sexual act between consenting adults have occurred in only a small number of states, and have taken centuries to achieve.[6] We adopted the law rather readily to current commercial practice in Lord Mansfield's day and nearly two centuries later, again, in the commercial code. Surely, a presumption that so frequently runs counter to fact and an arbitrary rule of evidence which shuts the mouth of the witness who should know best, must, in an age of secular humanism, yield.

I also should make it very clear what I am not deciding: I am not holding that the mother's husband would necessarily lose a father's rights here if

---

6. See: Robert V. Sherwin, The Law and Sexual Relationships, in Marcia E. Lasswell and Thomas E. Lasswell, eds., Love, Marriage, Family: A Developmental Approach, Glenview Ill., Scott Foresman, 1973, 221-228, as found in Rebecca M. Smith's Kleimer's Marriage and Family Relationships, 2d ed., New York, Harper & Row 1975, 303-304).

he were demanding or seeking them. I am not touching the blood test aspect of this at all for the reasons stated hereinbefore. Today, I am not denying the child the shelter of the presumption of legitimacy when that presumption would help the child, but I am saying that we can and will pierce this veil when it's in the best interest of the child to do it. Therefore, I think it was proper to receive Brenda Hockenberry's testimony of her husband's nonaccess when the purpose is not to bastardize the child, but to get her support.

Under all the circumstances then, I am finding as a fact that Wayne T. Ozenbaugh is the father of Amanda and hence make the following

## ORDER

And now, June 26, 1981, we will direct defendant, Wayne T. Ozenbaugh, to pay the sum of $110 a month for the support of one child.[7] The effective date of this order is May 26, 1981. Defendant will report any change of address to the Domestic Relations Office of Washington County.

---

7. Defendant made $14,892.21 for the year 1980, in seven months. The prosecutrix is on public assistance in Cameron County at the rate of $253 a month for herself and child with $89 a month being attributed to the child. If defendant wishes to pay this yearly $1,320 order in eight equal installments of $165, to coincide with his seasonal work, starting as of May 26, 1981, the Domestic Relations Office will spread it out over the year for Brenda Hockenberry.