In the Matter of ARLENE W., Appellant, *v.* ROBERT D., Respondent.

Fourth Department, May 20, 1971.

*Raichle, Banning, Weiss & Halpern (R. William Stephens* of counsel), for appellant.

*Rosen, Yasinow & Roberts (David C. Fielding* of counsel), for respondent.

WITMER, J. Petitioner appeals from an order of Erie County Family Court determining that respondent is not the father of her child, born September 17, 1968, and dismissing her petition for support for the child. We consider only two of the points raised by petitioner on this appeal.

Petitioner complains that the trial court was too restrictive of her attorney in his examination of respondent and his father. It appears that this point arose because of the manner in which petitioner's case was presented. Instead of proceeding in the usual manner and making a prima facie case through the testimony of petitioner and her supporting witnesses, petitioner first called respondent and later his father. The court ruled that petitioner's attorney could not lead, contradict nor cross-examine these witnesses, despite their obvious hostility. This was error. A party who calls as a witness an adverse party should not be bound by the latter's answers and should be permitted to lead and cross-examine him, he being obviously a hostile witness. (*Becker* v. *Koch,* 104 N. Y. 394, 401; *Matter of Cinque,* 25 A D 2d 752; *Wolper* v. *New York Water Serv. Corp.,* 276 App. Div. 1106; *Matter of Gallo,* 252 App. Div. 861; 3 Wigmore, Evidence [3d ed.], §§ 896–899; 1 Bender's New York Evidence, § 28.04, pp. 397 and 411.) This is particularly so in the type of case in which an examination before trial is not permitted, as has heretofore been the practice in filiation cases (see *Matter of Green* v. *Smith,* 65 Misc 2d 588; *Matter of Tilson* v. *Bark,* 52 Misc 2d 338;

*Matter of " Doe " v. " Roe "*, 40 Misc 2d 148; cf. *Green* v. *Brown*, 65 Misc 2d 226). Denials of examinations before trial in filiation cases have been made in reliance upon matrimonial cases wherein examinations before trial were denied or closely restricted prior to the recent amendments of the Domestic Relations Law. Such limitations on examinations before trial in matrimonial actions are now being relaxed (see *Dunlap* v. *Dunlap*, 34 A D 2d 889) and so should be the restriction on such examinations in filiation cases (see *Green* v. *Brown, supra*). At any rate, until examinations before trial in filiation cases are generally granted, a petitioner in such case should not be restricted in his calling and cross-examination of the respondent.

We note, however, that many of the court's evidentiary rulings were correct, and many of the questions addressed to respondent were so inexpertly phrased as to require that the objection thereto be sustained.

The principal point on this appeal concerns the merits of the petition. This requires a review of the evidence. Petitioner and respondent had been high school classmates, dating each other before graduation in 1967. That summer they continued dating, and after respondent acquired an automobile in mid-summer they began to go out together every night, sitting in the car in a drive-in theatre or elsewhere and making love. On such occasions by the end of the summer they would get in the rear seat of the car with a blanket over them and do " heavy petting ", removing their clothes.

In the fall respondent entered college and petitioner got a job. As her 18th birthday, November 11, 1967, approached, she and a girl friend decided to live together in an apartment and respondent drove them to various apartments for rent. They rented one, and respondent helped petitioner move into it on her birthday. Respondent continued to see petitioner daily, calling on her at the apartment, and they continued to conduct themselves as above described, going out in his automobile. Petitioner testified that on respondent's birthday on November 22, 1967 they remained in her apartment and had sexual intercourse for the first time, in her bed. She testified that it was the first time that she had ever had sexual intercourse and believes that it was the first time for respondent. She further testified that thereafter, either in the apartment or in respondent's automobile, they had sexual intercourse about every night until the end of December.

On December 8, 1967 petitioner's roommate went to Pittsburgh for an interview for employment as an airline hostess, and she

returned that night before 10:00 o'clock. Petitioner testified that on that evening respondent came to the apartment between 6:00 and 7:00 o'clock and she and he began making love in the living room and then went into the bedroom "to get more comfortable". Respondent confirms this. Petitioner says that they removed all of their clothes and had sexual intercourse. While so engaged her roommate rapped on the door to be admitted. Petitioner asked her to wait a minute. The roommate testified that after waiting a few minutes, she put down her packages and opened the door with her key and entered; and that petitioner came running out of the bedroom putting on her bathrobe; that respondent had on dungarees and a "T" shirt, and he put on his boots and left, petitioner running out the door after him barefooted.

Respondent admitted this incident, except he testified that he was not completely undressed in petitioner's bed and denies having engaged in sexual intercourse with her. He says that they only did "heavy petting".

At first, respondent denied having dated with petitioner after this occasion, but after hearing petitioner and her roommate testify that he continued to date petitioner regularly until late December, he retracted his testimony and admitted dating petitioner after November 22, including the occasion of December 8, which date the roommate fixed only as about two or three weeks before Christmas.

Just before the end of December, 1967 respondent invited petitioner to go to a private New Year's Eve party "where there would be some drinking", and she said that she did not wish to go, that she wanted to go "somewhere special". Apparently they were having some disagreements by this time. She was invited to double date with her roommate and go to "The Prime Rib", and she accepted. She told respondent of this, and he "was mad". She testified that she had no date with any other man in November or December until New Year's Eve; and on that night the girls said good night at the door, entered their apartment and went to bed.

In early January respondent called petitioner and came to the apartment, but because she and her roommate were not dressed, he was not admitted. He left and presently telephoned petitioner and said that he had only wanted to take her on an errand, but now she "could go to hell".

Petitioner and her roommate decided to give up the apartment in February, and she called respondent to come and get his records which he had left in the apartment. He got them, and the

next day returned and took petitioner to the drive-in theatre. She testified that again they had sexual intercourse in his automobile, but this time in the front seat, and " it just wasn't like before ". On no occasion did respondent use a contraceptive.

Petitioner missed her menstrual period in December and thereafter, and thought that she was pregnant but she did not go to a doctor for four months. When the doctor told her that she was pregnant, she called respondent and he talked with her in his automobile. He said, " I don't know what we're going to do ", but " we're not going to get married ". She went to see his father and he asked her to place the child for adoption with a particular agency, and he contacted a social worker and a lawyer to that end. She had difficulty thereafter in reaching respondent, and when he did come he said that he was not supposed to see her. With respect to adoption, she told him that he would have to sign the papers, and he said that he would. He also said that he hoped that the baby was a boy but that it would not have his allergy. The evidence is that he did have an allergy.

Petitioner and her mother went together to see respondent and his father at the latter's store. They testified that respondent told his father in their presence, in answer to the father's question, that it was his baby — " most likely is ". When petitioner's mother suggested marriage, the father said, " There will be no marriage."

Three months before the baby was born petitioner decided against adoption, that she would keep her baby; and in October, 1968 she instituted this proceeding to establish paternity and for support for the baby. A blood test did not exclude respondent.

As noted earlier, petitioner proceeded in an irregular manner and called respondent and his father as witnesses. After petitioner, her mother and roommate testified and petitioner rested, respondent also rested without offering additional testimony. Much incriminating testimony against respondent, therefore, went unanswered by respondent or his father, although they, respondent in particular, were present and in a position to answer, explain or deny, if petitioner's evidence was not true. Under such circumstances the trier of the facts may draw the strongest inferences possible from petitioner's evidence against respondent (*Noce* v. *Kaufman,* 2 N Y 2d 347, 353; *Dowling* v. *Hastings,* 211 N. Y. 199, 202; and 1 NY PJI 1:75 and Comment).

Proof of paternity is required to be " entirely satisfactory " to the trier of the facts, because it is recognized that a charge of paternity is easy to make and hard to disprove (*Drummond* v. *Dolan,* 155 App. Div. 449, 450–451). But because of the latter

rule of evidence a bona fide case of paternity is equally hard to prove. It is unnecessary to summarize the above evidence in support of petitioner's case. It is strong, and her testimony, recited in some detail above, contains a ring of simplicity, sincerity and truth. There is, in addition, another important element in this case. No claim is made by respondent that during the crucial period (presumably early December) petitioner even had a date with another man, and certainly no suggestion is made that petitioner had sexual relations with any other man. In fact, the evidence is that petitioner and respondent were together almost every night from the summer of 1967 until the end of December. Evidence of promiscuity, if present, would weigh heavily against petitioner (see *Matter of Edick v. Martin,* 34 A D 2d 1096; *Matter of Commissioner of Welfare of City of N. Y. v. Fields,* 25 A D 2d 504). By like token, absence of a scintilla of evidence of promiscuity, considered in the light of the admitted conduct of respondent with petitioner, together with his conduct with and statements to petitioner, her mother and his father after learning of petitioner's pregnancy, renders the evidence of his paternity of this child entirely satisfactory (*Matter of Patricia " O " v. Tracy " P ",* 35 A D 2d 1039; *Matter of Patricia " E " v. Claude " F ",* 33 A D 2d 870; *Matter of Lasda v. Abbess,* 30 A D 2d 1040). In our view the evidence against respondent is not only entirely satisfactory but compelling and requires a determination that respondent is the father of petitioner's child. (See *Matter of Mary " A " v. John " B ",* 28 N Y 2d 871.)

Were we not determining the question of paternity upon the merits of this record, we would reverse and grant a new trial because of errors in rulings upon petitioner's attempts to lead and cross-examine respondent as an adverse witness.

The order appealed from should be reversed on the law and facts, respondent should be declared the father of petitioner's child, and the matter should be remitted to Erie County Family Court for further proceedings consistent with this opinion.

MOULE, J. (dissenting). Petitioner complains of a number of rulings of the court made during respondent's cross-examination. She contends that respondent was a hostile witness, which obviously he was. However, the court refused to allow petitioner's attorney to ask him leading questions and ruled that she was " stuck with his answers ".

A party who calls an opposing party as a witness generally may, because he is hostile, cross-examine him (*Becker v. Koch,* 104 N. Y. 394, 401; *Matter of Cinque,* 25 A D 2d 752; Richardson, Evidence [9th ed.], § 515). However, respondent was not

required to testify when called by the petitioner (Family Ct. Act, § 531). The claimed error in the record was the result of petitioner's efforts to cross-examine respondent when he was called as a witness in petitioner's case, and the court's refusal to permit such examination. The resultant confusion justifies a new trial.

Petitioner testified that she first had intercourse with respondent on November 22, 1967; she was definite about the date, stating it was respondent's birthday. However, her doctor subsequently testified that petitioner's last menstrual period before the birth of the child began November 21, 1967. This certainly raises a substantial question as to petitioner's credibility. Further, petitioner's roommate, who claimed that she saw petitioner and respondent in compromising circumstances, was very careful to avoid mentioning the exact date. Respondent testified he never had intercourse with petitioner, and also that petitioner entertained other boys in her apartment.

While in an action tried by a court without a jury this court may grant such final judgment as it finds the trial court, upon the evidence, should have granted (*Hacker* v. *City of New York,* 26 A D 2d 400; *Bernardine* v. *City of New York,* 294 N. Y. 361; 7 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 5522.04), it would be better practice, in the instant case, to grant a new trial (*Power* v. *Falk,* 15 A D 2d 216, 218; *Victor Catering Co.* v. *Nasca,* 8 A D 2d 5, 9; 7 Weinstein-Korn-Miller, *supra,* par. 5522.05).

MARSH, J. P., CARDAMONE and HENRY, JJ., concur with WITMER, J.; MOULE, J., dissents in an opinion.

Order reversed on the law and facts, with costs, paternity declared and matter remitted to Erie County Family Court for further proceedings in accordance with this determination.