OPINION OF THE COURT
Irene Duffy, J.
This is an unusual contested paternity suit. The petitioner is male.
*616 The Legislature has only recently recognized the right of the male person to proclaim and prove his fatherhood of a child born out of wedlock. (Family Ct Act, § 522.) Many legal questions arising in this case have perhaps heretofore lay unresolved, providing merely exercises for classroom discussion.
Prior case law in paternity actions dealing with situations where the female is the petitioner, leave difficult burdens for the male petitioner in this case. For example, the respondent (here the mother) cannot be forced to testify and the petitioner (here the male) must prove by "clear and convincing” proof the date of conception and the respondent’s "nonaccess” to other men during the conception interval. The statutory privilege not to testify for the male respondent in a paternity case is grounded in public policy in view of the economic and social burdens incident to the finding of paternity. But where, as here, the male petitioner seeks to assume those burdens and there exists no such public policy rationale, should the standard of proof be lessened and may the court draw an inference against the mother by her failure to testify or controvert the petition?
It is with these issues in mind and the thorny factual questions ever present in a paternity proceeding that this court proceeds to consider the case before it.
This paternity proceeding was commenced on January 5, 1979 pursuant to article 5 of the Family Court Act. The petitioner is a 19-year-old man who seeks an order of filiation naming him the father of a female child born December 12, 1978, who has since been surrendered by her mother for adoption. The respondent has opposed this paternity action, and unsuccessfully moved for dismissal of this petition at the outset, specifically challenging petitioner’s standing to file the instant petition under section 522 of the Family Court Act where the child in question has been surrendered for adoption by the mother. (See John J. S. v Theresa L., 99 Misc 2d 578.) Accordingly, a fact finding was held on August 3, 1979 and August 7 and 8, 1979. Thereafter, posttrial briefs were submitted by both counsel, the last having been received on September 21, 1979.
As with most contested paternity matters, the court’s assessment concerning the credibility of the witnesses is of critical importance and the court has carefully observed the wit *617 nesses’ demeanors and manners of testifying and listened to the substance of their testimony, with this in mind.
The salient testimonial evidence adduced at trial is as follows:
The petitioner ("Jackie”) testified that he and the respondent ("Terry”) lived about 10 blocks from each other and attended different high schools when they were first introduced to each other by Jackie’s younger sister in early February, 1978. After meeting, romance ensued, and Jackie and Terry began dating regularly, seeing each other almost every day both after school and on each weekend. They frequently spent their evenings together in the homes of their respective families.
Jackie further testified that he and Terry began having sexual intercourse with each other in March, 1978, a couple of times per week until their relationship ended in July, 1978. In May, 1978, Terry told Jackie she believed she was pregnant and the couple discussed marriage. The relationship continued until mid-July, 1978 when Terry decided to end it due in part to Jackie’s heavy drinking. A few months after the breakup, Jackie left home and entered the Marine Corps.
Jackie did not tell his parents about Terry’s pregnancy until sometime in the early fall of 1978.
Peter O’Rourke, a 21-year-old friend of Jackie’s, who managed the beer distributor outlet where Jackie worked after school, testified as to his knowledge of the ongoing relationship between Jackie and Terry. Most importantly, Mr. O’Rourke testified that in mid-June, 1978 he met Terry on a street corner and she asked him if he had heard what happened, adding that Jackie and she had a problem, that she was pregnant and had missed two menstrual periods.
Jackie’s older sister Jean, a 21-year-old college student, also took the stand. She testified that Jackie had told her of Terry’s pregnancy in July, 1978. Jean further testified that she met Terry in a local restaurant sometime in mid-September, 1978 at which time she asked Terry if she was still pregnant, and whether it was Jackie’s baby. Terry answered "yes” to both questions.
Jackie’s mother, Mrs. Smith, also testified as to her knowledge of the "romance” between her son and Terry. She stated that Terry spent many evenings at the Smith home and that *618 Terry stopped by the house virtually on a daily basis to leave notes for Jackie.
The court found petitioner and his witnesses to be very credible. Petitioner, in particular, was forthright and direct in his testimony, and the substance of the testimony was candid, credible and devoid of meaningful inconsistency. Petitioner’s sister, Jean, also struck the court as particularly credible. She obviously felt very compassionate about Terry’s "toughing it out”, through the entire pregnancy without the help of her brother, Jackie.
Respondent, on her case in rebuttal, called three witnesses —her current boyfriend, Richard Gorman ("Ricky”), her father, and Sister Rosemarie, director of Rosalie Hall (the prenatal clinic of Misericordia Hospital).
Ricky testified that he had a romantic relationship with Terry which began in the latter part of 1977; that he began having sexual intercourse with her in October, 1977; that Terry ended their romance in February of 1978; and that they nonetheless continued to have sexual intercourse one or two afternoons per week in Ricky’s father’s car during the period when Terry was dating and having sexual relations with the petitioner.
The court finds Ricky’s testimony to be incredible and unworthy of belief. The court must state at the outset that Ricky, although a man of 21 years, impressed as an innocent —unaccustomed to lying or even exaggerating. He appeared very uneasy and apprehensive throughout his testimony, testified haltingly, and generally conveyed an impression of contrivance rather than forthrightness. His evident uneasiness at having to tell his fanciful story — his intonations, his demeanor —all bespoke his misplaced motivation and his obvious love and affection for Terry.
However, I discredit Ricky’s testimony not only because of his demeanor and manner of testifying but also because of several inconsistencies and because of the inherent incredibility of his testimony.
As regards the inconsistencies, one example will suffice. While claiming that he had sexual relations with Terry since October, 1977, Ricky nonetheless denied having such relations until after Terry’s 16th birthday. Terry did not turn 16 until June 10, 1978.
More importantly, Ricky’s version of the facts is inherently *619 unbelievable. It greatly strains this court’s common sense and imagination to believe that a man, then 20 years of age, burning with love for Terry would accept rejection by his beloved for another man yet continue to see her twice a week in the afternoons only as a sex object. Nor is it reasonable that such a young man could then revert to his presently patent romantic adoration of this young woman in the face of this knowledge of hypersexuality and promiscuity on her part. I also find it beyond belief that Terry, then 15 years old, could engage in sexual intercourse approximately six times per week, both day and night, with two young men for several months and maintain the facade of a "beautiful”[1] romantic relationship with one of them. Such Lolita-type activity does undoubtedly occur but it simply does not fit the composite picture of Terry which emerges from the testimony of the witnesses.
Terry’s father’s testimony reinforces the court’s belief that Ricky’s testimony is a complete fabrication. He testified as to Terry’s upbringing and homelife, all of which appears to be excellent and is not in dispute. He testified that he was aware of his daughter’s ongoing relationship with Ricky even while she was so seriously involved with Jackie, going so far as to state (in contradiction to Ricky’s testimony) that his daughter saw Ricky during this period not only on weekday afternoons, but on evenings and weekends, as well. Mr. Lane, in this court’s opinion, is hardly the type of father who would allow his daughter’s relationship with the young man who supposedly caused her pregnancy (Ricky) to continue under these circumstances." Yet, when asked by the court whether Terry still goes out with Ricky in the young man’s car, he answered "yes” very matter of factly. This reaction is entirely out of character for this obviously intelligent, caring and protective father. On the other hand, if Ricky was looked upon by the father as a noble friend who willingly takes the blame for another’s actions in order to bring about a favorable disposition in this case, then this type of father might reasonably be expected to look at the boy, Ricky, with gratitude and kindness and would allow the relationship with his daughter to continue.
Sister Rosemarie’s testimony did little to bolster respondent’s case. Indeed, it had the opposite effect. Although the *620 intake data sheet completed when respondent first visited Rosalie Hall in November, 1978 lists Richard Gorman as the father of the child then in útero, Sister Rosemarie effectively admitted her knowledge that this initial information was false. Sister Rosemarie testified that on December 21, 1978 she wrote a letter to the Catholic Home Bureau alerting them to Terry’s desire to surrender the newborn for adoption and also stating that the mother no longer had a relationship with the father of the child. When asked by the court she admitted she was not referring to Richard Gorman.[2]
It is obvious that this court does not know, and will never know all the factors that make up this saga. Nor can this court be entirely certain about what motivates the parties to their particular position.
What would motivate Jackie to claim he was the father if he was unsure that he was the father? What would he gain, other than a baby that he is obligated to support until age 21 years, hardly an attractive reward to one who did not believe he was the father. On the other hand, if he believed he was the father his motivation might have been made hp of several components, perhaps the dim possibility of regaining Terry, or perhaps just the desire to undo the wrong he believes he did, to take up his responsibilities and to erase the memory of his earlier abandonment.
And, what would motivate Terry? Some may argue that if she believed Jackie was the father she would merely give him the baby that she had put up for adoption. However, she too might be motivated by several different factors. The first, of course, might be revenge. She may also be trying to erase the entire chapter from her life. By putting the baby up for adoption the erasure would be complete. But, if Jackie had the baby — she and her family would be unable forever to escape that page in her history. Moreover, the baby living so close would continue forever to haunt her life. Added to this might also be her sincere motivation to protect the baby and give the baby to an adoptive couple that could perhaps provide much more material care than she could ever expect to be given the baby by this 19-year-old Marine.
The court, however, cannot allow speculation as to the *621 motivations of the parties or an assessment of the future emotional reprecussions to the parties or even the child, dictate its factual determinations. The consideration of possible motivations is relevant only insofar as it may aid in assessing credibility where credibility is clearly so critical. The court is concerned here only with one issue of fact — has the petitioner established by the requisite standard of proof that he is the biological father of the child. The court finds that he has.
This court is of the belief that the male petitioner in a paternity suit should not have the same burden of proof as a female petitioner. (But see Zachman v Sally, NYLJ, Feb. 2, 1977, p 14, col 1, wherein Judge Cannavo of Suffolk County Family Ct reaches an opposite conclusion.) This court believes that the purpose and nature of the proceedings are entirely different, when as here the male is the petitioner.
A paternity suit initiated by a male petitioner is clearly a civil suit which should, in this court’s opinion, be governed by the preponderance standard. The quasi-criminal nature of these proceedings and the considerable economic and emotional burdens and consequences encountered by the unsuccessful male respondent in such a suit to support the child until its 21st birthday is no longer applicable, where as here the respondent female is admittedly the child’s mother. Moreover, the difficulty of the traditional male respondent in disproving the charge of paternity made by a female petitioner is also inapplicable.
Indeed the reverse is true. Surely, the defense task of the female respondent who alone has personal knowledge of many of the essential elements in such a suit is relatively easy — as compared to that of the traditional male respondent.
Fortunately, however, it is unnecessary for this court to make such a holding. This court believes that this petitioner, even applying the traditional standard of proof, has maintained his burden to this court’s entire satisfaction.
Under traditional law the petitioner has the burden of establishing his paternity of the child, Rebecca, by evidence which is "clear and convincing” (Matter of Hawthorne v De Both, 42 AD2d 827). The essential elements of proof are few: that he had sexual intercourse with the respondent during the interval when conception must have taken place, that no other male had similar access to the female respondent during that time, and that a child was born out of that conception.
*622 The respondent mother did not testify at trial, nor could she be compelled to testify by petitioner[3] (see Family Ct Act, § 531). Accordingly, the interval during which conception must have taken place must be ascertained, if possible, from the medical records entered into evidence. These records clearly indicate that the child was born prematurely on December 11, 1978 weighing 4 pounds 13 ounces, and that the delivery obstetrician estimated the gestation period at birth to be 33 weeks, i.e., 231 days. The court takes judicial notice of the fact that the normal period of gestation, using conception as the starting point, is approximately 266 days (Matter of Morris v Terry K., 60 AD2d 728; Matter of Kathy L. R v Steven S, 52 AD2d 974), and that the normal period of gestation, using the last day of menstrual flow as a starting point is 280 days. (See Schatkin, Disputed Paternity Proceedings [4th ed rev], § 25.01, and authorities cited therein.) Thus, by the former measurement the estimated date of conception would be April 24, 1978 and by the latter measurement the estimated date of last menstrual flow would be April 24, 1978. By either standard, conception would have occurred no earlier than the month of April and no later than the month of May. It is not necessary that the court establish the date of conception to a medical certainty (Matter of Margie L v Gary M, 50 AD2d 1009; Greenburg v Colman, 32 AD2d 913) and the court has here determined the interval during which conception must have occurred.
. Further, the court notes that while petitioner has sustained his burden of proof without any need to rely on any adverse inference drawn from respondent’s failure to testify, it is the court’s opinion that such an inference is available to the petitioner and could further bolster his otherwise sufficient case. Although respondent has a statutory right not to testify under section 531 of the Family Court Act, that statutory provision does not address itself to the question of whether the trial court may draw an inference in favor of the petitioner’s testimony. In a well-considered opinion, Judge Palmer of this court has previously examined this issue and concluded that insofar as a paternity proceeding is now a civil action (not *623 withstanding its quasi-criminal origins, see former NY City Crim Ct Act, § 60) a construction denying any inference against a respondent who exercises the privilege is unwarranted. (Matter of Commissioner of Social Servs. v James S., 75 Misc 2d 971, 974-978.) The James S. court (pp 977-978) determined that, as limited by its judicial construction, the privilege afforded by section 531 of the Family Court Act "would appear to be simply one that a respondent can avoid being called and examined as a hostile witness by the petitioner’s attorney. He may defer his testimony until he has had a chance to test petitioner’s prima facie case by motion.”
At least one appellate decision rendered prior to James S. lends support to its statutory construction of section 531 of the Family Court Act. (See Matter of Arlene W. v Robert D., 36 AD2d 455.) In 1975, both the Second and Third Departments of the Appellate Division spoke to this issue. The Third Department has stated that where a respondent fails to testify on a crucial issue of fact but merely offers the testimony of a third party which is of dubious probative value, "the trier of fact may draw the strongest inference possible from petitioner’s evidence against appellant.” (Matter of Jay v Andrew "Y” 48 AD2d 716.) On the other hand the Second Department has tersely stated, in a decision five sentences in length which affirmed an adjudication of paternity on the facts, that "no inference should have been drawn from appellant’s failure to testify.” (Matter of Renee K. v Robert P., 50 AD2d 604.) As far as this court’s research can determine the First Department has not stated its views on this issue.
This court believes that those cases holding that an inference may be drawn against the respondent are most persuasive, particularly in light of the 1976 amendment to section 522 of the Family Court Act which first afforded putative fathers the right to initiate paternity proceedings and which underscores the purely civil nature of these proceedings.[4] It is noteworthy that section 531 of the Family Court Act was also amended in 1976 but the Legislature retained the gender-neutral term "respondent” thereby extending the testimonial privilege to female respondents. Whether this was by inadvertance or not this court cannot say. Undoubtedly, however, it is *624 a question that will appear again as other male persons seek to have their fatherhood adjudicated.
In the context of a paternity petition initiated by a male, such as that before the court, proof of nonaccess by other men during the period of possible conception can be accomplished only by testimony as to his own knowledge and belief on the subject and the reasonable inferences which may be drawn from the nature and duration of the relationship his evidence establishes existed. This was accomplished in this case to the court’s entire satisfaction on petitioner’s prima facie case. As previously stated, the discrediting of respondent’s proffered rebuttal testimony by a third party on the issue of access leaves petitioner’s prima facie case intact and indeed lends further support to the finding that he has sustained his burden of proof by the requisite clear and convincing evidence.
The court makes the following findings of fact:
(1) Respondent engaged in sexual intercourse exclusively with the petitioner from March, 1978 to July, 1978.
(2) The child, Rebecca Lane, was conceived sometime in April, or May, 1978.
(3) Respondent gave birth to the child on December 11, 1979.
Accordingly, upon due consideration of the briefs submitted by both parties, and after examination and inquiry into the facts and circumstances of the case and after hearing the proof and testimony offered in. relation thereto, it is the judgment of this court that the evidence adduced is clear, convincing and entirely satisfactory to establish that the petitioner is the father of Rebecca Lane.
Therefore, it is adjudged and declared that petitioner Jackie Smith is the father of Rebecca Lane; and it is ordered that an order of filiation[5] be entered in accordance with this decision.

. See petitioner’s Exhibit I wherein Terry states that she and Jackie "had something beautiful.”

. The court notes that while reviewing the Rosalie Hall records on respondent after trial it came across a scribbled note which reads: "boy is not really father of the baby.” Unfortunately, this note was not brought to the court’s attention during trial and no testimony was elicited as to the meaning of this note.

. Respondent’s only statement during the course of this proceeding is in the form of an affidavit submitted in support of her pretrial motion to dismiss. That statement contains no denial of the allegations of the petition, but does contain an admission, by clear implication, that petitioner engaged in sexual intercourse with respondent prior to her 16th birthday.

. This is particularly true because the law has not clearly defined what pretrial discovery methods are available to a male petitioner in paternity suits (see, e.g., Maureen E. O’H. v Nicholas C., 65 AD2d 491, wherein a female petitioner’s request for an examination before trial of the male respondent was denied).

. The petitioner’s oral request for custody of the child is not properly before the court at this time and nú determination is made thereon.