506 A.2d 918

Jerry Wayne WILLIAMS, Appellee,

v.

Franklin Andrew MILLIKEN and Rhoda Pearl Milliken, husband and wife, and Frank Milliken and Cindy Milliken, husband and wife, Appellants.

Superior Court of Pennsylvania.

Argued May 13, 1985.

Filed Jan. 24, 1986.

Reargument Denied April 8, 1986.

J. Philip Bromberg, Pittsburgh, for appellants.

David F. Megnin, Kittanning, for appellee.

Before SPAETH, President Judge, and ROWLEY and WIEAND, JJ.

## OPINION OF THE COURT

ROWLEY, Judge:

This is an appeal from the trial court's Order determining that Jerry Wayne Williams, appellee, is the natural father of two minor children, Jeremiah James Fornell and Miranda Nicole Milliken a/k/a Miranda Nicole Fornell, and granting legal custody of the children to appellee. We find that appellee failed to meet his burden of proving that he was the father of Jeremiah and that the trial court did not apply the proper burden of proof to appellee's claim of paternity of Miranda. Accordingly, we reverse the trial court's order as to the paternity of Jeremiah and vacate the order as to Miranda and remand for further proceedings and application of the proper burden of proof as to the paternity of Miranda.

Sherry Noreen Fornell, the natural mother of Jeremiah and Miranda, died on April 23, 1983 from complications following the birth of Miranda on April 13, 1983. Following Sherry's death, Miranda was in the physical custody of Franklin J. and Cindy Milliken, Sherry's brother and sister-in-law. In April of 1984, Franklin J. and Cindy Milliken separated and since that time, Miranda has been in the physical custody of Franklin A. and Rhoda Milliken, her maternal grandparents. Jeremiah Fornell, born October 2, 1978, has resided with Franklin A. and Rhoda Milliken for the majority of his life, and they have been his primary caretakers.

On August 31, 1983, appellee filed a "Petition for Custody", naming Franklin A. and Rhoda Milliken and Franklin J. and Cindy Milliken as defendants, wherein he alleged that he was the father of both Jeremiah and Miranda, that he and Sherry Fornell had entered into a common law marriage, and that he was entitled to custody of both children. On October 29, 1983, appellants filed an Answer to appellee's petition for custody, denying that appellee was married to Sherry Fornell and denying that appellee was the father of Jeremiah and Miranda.

On November 30, 1983, appellee filed a motion requesting that Franklin A. and Rhoda Milliken and Franklin J. Milliken submit to Human Leukocyte Antigen (HLA) blood testing. The motion was granted. On December 5, 1983, the Order of November 30, 1983 granting the request for the HLA blood tests were stayed pending resolution of a rule to show cause why that Order should not be vacated. Prior to resolution of the issue regarding blood tests, hearings were held on January 31, March 26 and August 2, 1984, regarding the alleged paternity of appellee and custody of Miranda and Jeremiah. Appellee presented the following evidence relevant to the issue of his paternity.

Appellee testified that he first met Sherry Fornell in April of 1976 or 1977 in Illinois and that they began living together shortly thereafter. (N.T., January 31, 1984 at 64.) Appellee admitted that Sherry was married to Stewart Fornell when he first met her and that she did not obtain a divorce from him until sometime in 1980. (N.T., January 31, 1984 at 69.) Similarly, appellee admitted that he was married to Lauraleen Garland when he met Sherry Fornell and that they were not divorced until May 5, 1978. (N.T., March 26, 1984 at 28.)

Appellee further admitted that he had a substantial criminal record and that he was incarcerated in June of 1978 following his conviction for burglary of a drug store in Wisconsin. (N.T., January 31, 1984 at 88–89, N.T., March 26, 1984 at 18–20.) At the time he was imprisoned, Sherry was six months pregnant with Jeremiah. (N.T., January 31,

1984 at 65–66.) Appellee served four and one-half months of a six month sentence for the Wisconsin burglary before being extradicted to Illinois in November of 1978 regarding violation of his parole in that state. Upon his extradition to Illinois, he was sentenced to three years imprisonment for two counts of burglary and forgery stemming from his unauthorized entry into an animal hospital. (N.T., January 31, 1984 at 88–89, N.T., March 26, 1984 at 18–19.) Appellee was incarcerated for eighteen months from November of 1978 to June of 1980, at which time he was released on parole. During this period, he stated that Sherry visited him when he obtained work release and they had sexual intercourse. (N.T., March 26, 1984 at 45, 68.) Appellee was apparently arrested again in June of 1980, and in August of 1980 he was again convicted of burglary in the state of Illinois and sentenced to four years imprisonment. (N.T., March 26, 1984 at 23–26.) Appellee was then imprisoned from August 1980 until December of 1981, at which time he was again released on parole. (N.T., March 26, 1984 at 25–26.)

When appellee was released from prison in December of 1981, he traveled to Armstrong County, Pennsylvania to visit with Sherry Fornell at the home of Rhoda and Franklin A. Milliken. (N.T., January 31, 1984 at 67.) Sherry had moved back to Pennsylvania in October of 1978 shortly after the birth of Jeremiah. Appellee testified that he then returned to Illinois to collect his belongings and to have his parole transferred. He stated that he returned to Pennsylvania in February or March of 1982 and that he and Sherry resided in a garage apartment for a short period of time. He testified that they subsequently moved to a trailer in Adrian, Pennsylvania, and then to a trailer in Cowansville, Pennsylvania, where he resided with Sherry until her death in April of 1983. (N.T., January 31, 1984 at 67.)

Appellee also stated that Sherry had a tubal pregnancy in 1981 and an abortion sometime in 1979 and that he believed that she had become pregnant by him in both instances. (N.T., January 31, 1984 at 68, N.T., March 26, 1984 at 68.)

Appellee also testified that he and Sherry had sought fertility counseling in 1982, that Sherry became pregnant again several months later, and that her due date was July 4, 1983. (N.T., January 31, 1984 at 69.) Thus, Miranda was conceived during October or November of 1982. Although appellee considered himself as being married to Sherry, he stated that he did not formally marry her because it would have reduced monthly public assistance payments that she received. (N.T., January 31, 1984 at 71–72.)

Appellee testified that he visited Sherry every day while she was in the hospital regarding the birth of Miranda, April 12 through April 23, 1983. (N.T., March 26, 1984 at 45–46.) In June of 1983, appellee began living with Agnes Mowry and her eleven year old son, Carl, in Kittaning, Pennsylvania. He stated that he intends to marry Ms. Mowry. (N.T., January 31, 1984 at 73.)

Appellee admitted that he received a subpoena directing him to bring copies of his tax returns prior to January of 1984 and copies of his divorce decrees to court. However, he stated that he did not produce these records because he was unable to find them; he admitted that he had made no attempts to secure the records requested. (N.T., January 31, 1984 at 82–83, N.T., March 26, 1984 at 39, 54–55.)

Harry T. Blaney, secretary-treasurer of Paul's Auto Parts in Armstrong County, testified that appellee has been employed at Paul's since May 12, 1982 as a counter-clerk. (N.T., January 31, 1984 at 12–13.) He stated that appellee listed Sherry as his wife and Jeremiah as his child for health insurance purposes and that appellee initially claimed three exemptions for tax withholding purposes; however he changed his exemption status to zero in January of 1983. (N.T., January 31, 1984 at 13–16.)

Peggy Ann Spence, a family service worker for the Headstart program in Armstrong County testified that Jeremiah was enrolled in Headstart sometime in October of 1982. (N.T., January 31, 1984 at 28.) She stated that she was required to visit the home of Sherry Fornell every second week. (N.T., January 31, 1984 at 28.) She further

stated that Sherry looked pregnant in October or November of 1982 and that during one visit with Sherry, she noticed bruises on her arm. (N.T., January 31, 1984 at 32–35.) Ms. Spence testified that Sherry told her that appellee had shaken her because he didn't believe that the baby she was carrying was his child. (N.T., January 31, 1984 at 35–39.) Ms. Spence also stated that Sherry told her that appellee was the father of Jeremiah. (N.T., January 31, 1984 at 30.)

Tracy Elaine Johns, a distant relation of Sherry's, testified that Sherry told her on numerous occasions, that appellee was Jeremiah's father. (N.T., January 31, 1984 at 43.) Anna Jane Cook, a casual acquaintance of Sherry's also testified that when she met Sherry and appellee at the Vernon Hotel in March of 1983, Sherry told her she was married to appellee. (N.T., January 31, 1984 at 49–50.) Ms. Cook also stated that Sherry indicated that she was pregnant with appellee's baby and that they had a four-year old child at home. (N.T., January 31, 1984 at 51–54.)

Rosalie Lee Waugaman testified that she attended Bingo with Sherry and that Sherry had also told her that Jeremiah was appellee's son and that appellee was the father of the baby she was carrying. (N.T., January 31, 1984 at 54–56.)

Terry Lynn Long, the registered Records Administer at Armstrong County Memorial Hospital, stated that Sherry Fornell was admitted to the emergency room on April 12, 1983, that she was approximately six months pregnant at that time, and that she was having contractions. (N.T., March 26, 1984 at 4–5.) The Emergency Department records show that Jerry Williams was first listed as "husband" in the "nearest relative or friend" category, but that the word was then crossed out and the word "friend" was typed in that space. (Petitioner's exhibit # 6.) Sherry was transferred to Magee-Women's Hospital on April 13, 1983. (N.T., March 26, 1984 at 6–8.) The relevant records regarding Sherry Fornell's stay at Magee-Women's Hospital and Miranda's birth were admitted through the Hospital's custodian of records. (N.T., March 26, 1984 at 6–10.) The registration records from the Hospital list Jerry Williams as

a "friend" (Petitioner's exhibit # 7) and the birth record lists Miranda's last name as "Fornell". (Petitioner's exhibit # 8.) However, the Birth Record also indicates that the information regarding Miranda came from the baby's grandmother, Rhoda Milliken, and not Sherry Fornell herself. In a letter to the Bureau of Vital Statistics in New Castle, Pennsylvania, from the Records Department at Magee-Women's Hospital dated April 25, 1983, it was stated that the mother was unable to be interviewed regarding the baby because of her medical condition. The letter further stated that Jerry Wayne Williams had subsequently called the Hospital and stated that he was the father of Miranda. (Petitioner's exhibit # 9.)

Appellants presented the following evidence relevant to appellee's paternity at the hearings in this case. Frank Yeropoli, an employee at the Division of Vital Records in New Castle, Pennsylvania, testified that Miranda's birth certificate listed her last name as "Milliken" because of the confusion surrounding Miranda's birth and the inability of the medical records department at Magee-Women's Hospital to give him definite information. (N.T., August 2, 1984 at 18–23.)

Robert Page, an Income Maintenance Manager for the Armstrong County Board of Public Assistance, testified that Sherry Fornell first received assistance for Jeremiah from November of 1978 until July of 1980. (N.T., August 2, 1984 at 30–32.) Mr. Page stated that Sherry listed Jerry Williams, Chicago, Illinois, Cook County Jail, as Jeremiah's father on her November 1978 application. (N.T., August 2, 1984 at 34.) On subsequent reviews in June of 1979 and December 10, 1979, she again listed Jerry Williams as Jeremiah's father. (N.T., August 2, 1984 at 34.) In December of 1981, on reapplication for assistance, Sherry again listed appellee as the father of Jeremiah, however, upon review in February of 1982, Sherry listed Thomas Huse, Hazelcrest, Illinois, as Jeremiah's father. (N.T., August 2, 1984 at 35.) Upon subsequent review in June of 1982,

Sherry again listed Thomas Huse as Jeremiah's father. (N.T., August 2, 1984 at 35.)

Franklin A. Milliken testified that he and Rhoda Milliken were married in January of 1951, after Rhoda obtained a divorce from her previous husband. (N.T., August 2, 1984 at 77.) However, they had been living together for a period of time prior to their marriage and it was during that period that both Franklin J. and Sherry were conceived and born. (N.T., August 2, 1984 at 77–78.) After he married Rhoda, he instituted proceedings by which he formally adopted both children. (N.T., August 2, 1984 at 78.)

Franklin A. testified that Sherry married Stewart Fornell in September of 1973 and that they were divorced in July of 1980. (August 2, 1984 at 55–56.) He testified that he and his wife traveled to Chicago, Illinois in October of 1978, shortly after Jeremiah's birth, and that they returned to Pennsylvania thereafter with Sherry and Jeremiah. (N.T., August 2, 1984 at 57.) Franklin testified that during the period between December of 1978 through November of 1981, Sherry traveled to Chicago with Jeremiah for a one month period in December of 1978 and again for an eight month period from April to November of 1980. Sherry made other trips to Chicago during this period, however, Jeremiah remained with his grandparents. (N.T., August 2, 1984 at 57–59.)

Franklin A. testified that Sherry rented an apartment in Armstrong County at the Olinger residence in February of 1982. (N.T., August 2, 1984 at 59.) Franklin A. also stated that Sherry rented a trailer in Adrian in August of 1982, and that she lived there until November of 1982, at which time she rented another trailer in Cowansville. (N.T., August 2, 1984 at 60.) Franklin admitted that Jerry and Sherry resided together from February 1982 until Sherry's death in April of 1983. However, he also stated that Jeremiah resided primarily with he and his wife during that period of time. (N.T., August 2, 1984 at 59, 78–79.) He further testified that Jeremiah often stayed with Sherry in the fall of 1982 because Jeremiah was enrolled in a Head-

start program that was nearer to Sherry's trailer in Cowansville than it was to the Milliken home. (N.T., August 2, 1984 at 61–63.)

Franklin A. testified that Sherry gave birth to Miranda Nicole on April 13, 1983 and that Miranda was released into the custody of his wife, Rhoda, on May 30, 1985. (N.T., August 2, 1983 at 63–64.) Sherry's brother, Franklin J. Milliken and his wife, Cindy, cared for Miranda until April of 1984, when they separated; since that time, Miranda has been residing with Franklin A. and Rhoda Milliken.

Walter Collar, a part-time bartender at Ab's Tavern in Cowansville, testified that he knew both Sherry and appellee. (N.T., August 2, 1984 at 130–131.) He stated that Sherry came into the bar occasionally and that during hunting season, October of 1982, he saw her leave the bar with Donald Black. (N.T., August 2, 1984 at 132–133.) A few weeks later he saw Sherry with Donald Black a second time in the parking lot of the American Legion. (N.T., August 2, 1984 at 133.)

Donald Black testified that he had known Sherry since she was a young girl and that he first went out with her in August of 1982, a date he remembers because it was after his birthday. (N.T., August 2, 1984 at 136–137.) He testified that he met Sherry several times thereafter at Ab's Tavern and at the American Legion. (N.T., August 2, 1984 at 137.) He stated that he went out with Sherry four or five times between the fall of 1982 and Christmas of that year, that they rode around back roads in his car and drank and that they had intercourse almost every time he saw her. (N.T., August 2, 1984 at 138–140.) He also testified that he did not use any form of birth control when he and Sherry were intimate. (N.T., August 2, 1984 at 143.) Mr. Black admitted that he was a good friend of the Milliken family, but he also stated that he testified regarding his intimacy with Sherry because it actually happened. (N.T. August 2, 1984 at 142–144.)

On August 2, 1984, the trial court entered an Order directing Franklin A. Milliken, Rhoda Pearl Milliken, Frank-

lin J. Milliken, Jeremiah Fornell, Miranda Fornell (Milliken), and Jerry Wayne Williams to submit to the drawing of blood for the purpose of conducting HLA blood tests. On August 13, 1984, appellants filed exceptions to the Order of August 2, 1984. Appellants' exceptions were dismissed on September 4, 1984 and the above-mentioned persons were directed to comply with the Order directing them to submit to HLA testing. On October 12, 1984, the court further directed that appellants either refuse or agree to consent to the HLA blood tests. On October 19, 1984, appellants informed the court by letter that they refused to comply with the court's Order. (Letter filed of record, November 6, 1984.)

On November 6, 1984, the trial judge filed an Opinion and Order determining that Jerry Wayne Williams was the natural father of Miranda and Jeremiah and awarding physical and legal custody of Miranda and Jeremiah to appellee. On November 16, 1984, appellants filed a Motion to Stay the Order directing that custody of the children be transferred to appellee pending appeal to the Superior Court and a Motion for Reconsideration of that same Order. On November 16, 1984, the trial court denied the motion for reconsideration; however, the court also ordered that the November 6, 1984 Order granting full custody of Miranda and Jeremiah to appellee be partially stayed. The court's order provided for shared custody of the children pending disposition of this appeal.

Appellants filed this timely appeal from the Order of November 6, 1984. On appeal, appellants contend that appellee failed to present sufficient evidence to rebut the strong presumption that Jeremiah was the son of Stewart Fornell, to whom Sherry was married at the time of his conception and birth. Thus, appellants argue that the trial court erred in finding that appellee was the father of Jeremiah. A careful review of the evidence presented convinces us that, as a matter of law, the evidence was insufficient to meet appellee's burden of producing overwhelming evidence and that appellee failed to overcome the

presumption that the father of Jeremiah was Sherry Fornell's husband.

Sherry married Stewart Fornell in 1973 and they were not divorced until July of 1980. Jeremiah was born on October 2, 1978, during Sherry's marriage to Stewart Fornell and thus, a strong presumption of legitimacy arises. *Connell v. Connell,* 329 Pa.Super. 1, 477 A.2d 872 (1984); *Commonwealth ex rel. Spangler v. Spangler,* 283 Pa.Super. 190, 423 A.2d 1053 (1980). "The burden of proof rested on [appellee] to show clear, direct, convincing and unanswerable evidence of non-access or lack of sexual intercourse or impotency [of the husband]." *Connell v. Connell,* 329 Pa.Super. at 6, 477 A.2d at 875; *Commonwealth ex rel. Spangler v. Spangler,* 283 Pa.Super. at 195, 423 A.2d at 1055 (1980) (Brosky, J., concurring). *See Cairgle v. American Radiator and Standard Sanitary Corp.,* 366 Pa. 249, 77 A.2d 439 (1951). But compare *P.B.C. v. D.H.,* 396 Mass. 68, 483 N.E.2d 1094 (1985) [where a child is conceived during the marriage, the husband of the child's mother is presumed to be the father of the child, and a man other than the husband of the mother has neither a constitutional nor common law right to rebut the presumption; where a child is born to, but not conceived by, a married woman, a man other than her husband can rebut the presumption that the husband is the father of the child but must do so by proof beyond all reasonable doubt.] In *Burston v. Dodson,* 257 Pa.Super. 1, 390 A.2d 216 (1978), this Court explained that "unanswerable" cannot be read literally, but must be read to mean that proof of the husband's non-access must be " 'exceedingly strong' or 'overwhelming', i.e., more than proof that is clear and convincing but not so much more as to exclude every possibility." *Id.,* 257 Pa.Superior Ct. at 12, 390 A.2d at 221.

In the instant case, the period of Jeremiah's conception would have been between December 1977 and January 1978. Appellee testified that he lived with Sherry Fornell in Chicago, Illinois from April of 1976 or 1977 until June of 1978. However, there was no evidence whatsoever presented by appellee regarding whether Sherry was in contact

with Stewart Fornell at that time, whether they had separated, whether she had sexual relations with her husband or whether Stewart Fornell was living in the Chicago, Illinois area. Given the lack of evidence of record concerning Stewart Fornell's whereabouts and contacts with Sherry during this period, it follows that appellee was bound to produce "overwhelming" evidence that he was the father of Jeremiah. *See Burston v. Dodson*, 257 Pa.Super. at 13, 390 A.2d at 222 (if the evidence of il legitimacy is of overwhelming weight, it may be sufficient to overcome and rebut the presumption of legitimacy). Appellee failed to produce such probative evidence. The only testimony that corroborated appellee's own self-serving testimony that he was the father of Jeremiah was the testimony of three friends of Sherry and a family service worker. Each of these women testified that Sherry told them that Jeremiah was appellee's son. Nonetheless, we do not find this testimony sufficient to overcome and rebut the presumption of legitimacy, especially where, as here, the mother of the child is unable to testify and there is no direct corroborative evidence. Jeremiah was conceived and born in Illinois and there was no testimony offered to support appellee's contention that he resided with Sherry Fornell in Illinois. Jeremiah was given the last name of Fornell and appellee has not consistently acted as though he is Jeremiah's father. Appellee has not contributed financially to the support of Jeremiah nor did he hold Jeremiah out as his son prior to the initiation of these proceedings. Moreover, Sherry consistently introduced Jeremiah as "Jeremiah Fornell" and that was the name he used at school.

In determining that appellee was the father of Jeremiah (and Miranda), the trial court initially noted that the natural mother's death, coupled with the lack of HLA blood testing results, hampered the court "in making a conclusive determination." However, the court relied on the above-mentioned testimony of Sherry's friends and on appellee's own testimony in concluding that appellee was the father of both Jeremiah and Miranda. (Opinion of House, J., November 6,

1984 at 4–5.) The trial court stated that the "[d]efendants have failed to produce any evidence which indicates that plaintiff is not the father of the children." (Opinion of House, J., November 6, 1984 at 5.) The trial court did not discuss the burden of proof in its opinion, nor did it make a separate determination of paternity regarding each of the children herein involved. Moreover, the trial court stated that appellants were bound to show that appellee was not the father of Jeremiah. On the contrary, we find that appellee was bound to produce overwhelming evidence that Sherry's husband was not the father of Jeremiah in order to rebut the presumption of legitimacy. Our review of the record reveals that such evidence was not presented, and accordingly, the trial court erred in finding that appellee was the father of Jeremiah.

Appellant's second contention is that appellee failed to meet his burden of proving that he was the father of Miranda. Specifically, appellants argue that paternity cannot be attributed to appellee because there was evidence offered to prove that Sherry Fornell had intercourse with other men during the period within which Miranda was conceived. The trial court, in determining that appellee had proved his paternity, did not discuss the burden of proof to be met by appellee. Our research has uncovered no case that discusses the burden of proof which must be applied when a man, after the mother of a child born out of wedlock has died, claims paternity of the child so as to obtain custody.

Although neither case law nor statutory law has addressed the issue before us, both have prescribed the applicable burden of proof in somewhat related situations. To obtain a support order for a child born out of wedlock against the putative father, the claimant need only prove paternity by preponderance of the evidence.[1] 42 Pa.C.S. § 6704(g); *Commonwealth ex rel. Johnson v. Peake,* 272

---

1. The issue of the constitutionality of finding paternity in support actions by only a preponderance of the evidence is presently before the Pennsylvania Supreme Court. *Minnich v. Rivera,* No. 161 E.D.Appeal Docket 1984.

Pa.Super. 340, 415 A.2d 1228 (1979). However, in such a support proceeding, the putative father is not pursuing the action to obtain the protected rights and privileges, as well as responsibilities, concomitant with the legal acknowledgment of the parent/child relationship. Rather the mother is attempting to establish paternity to force the man to support the child she claims he fathered. Also, the natural mother, whose testimony is relevant and frequently persuasive in paternity actions, is usually available to testify.

■ In the case before us, appellee has claimed paternity of the two children in order to obtain the rights and privileges of a parent but only after the natural mother of the children has died. During the mother's lifetime, appellee took no steps to legally assert paternity of the children and accept the responsibilities of parenthood. Therefore, we hold that the preponderance of the evidence test used in support proceedings is inapplicable here.

The Probate, Estates and Fiduciaries Code, 20 Pa.C.S. § 101 *et seq.* provides that for purposes of descent by, from, or through a child born out of wedlock, the child is considered the child of his father if paternity is established by *clear and convincing* evidence. 20 Pa.C.S. § 2107. In most instances in which § 2107 applies, one or both of the parents of the child whose lineage is questioned has died and is unable to testify to the paternity of the child; whereas a support action is ordinarily brought while both the natural mother and putative father are alive and each can testify to the paternity of the child. It is this crucial difference in the availability of key witnesses which necessitates the clear and convincing standard of proof applied to determine paternity for purposes of descent. See *Estate of Hoffman*, 320 Pa.Super. 113, 466 A.2d 1087 (1983) (claims of paternity made after the lips of the alleged father have been sealed by death for purposes of inheritance, are in that class of claims which must be subjected to the closest scrutiny.)

■ The policy reasons for imposing a higher burden of proof on one claiming paternity after at least one of the parents of the child has died are clear. If the person alleging paternity prevails, he or she will certainly receive a substantial benefit. A natural mother who establishes a decedent to be the father of her child can obtain death benefits and inheritance rights for her child; [77 Pa.S. § 562; 20 Pa.C.S. § 2107(c)]; a child who has reached his majority can likewise receive distribution from his father's estate by establishing who his father was; and a father establishing paternity of a child after the mother dies, can obtain an award of custody and the right to decide where and how to raise the child and the right to control any assets of the child on the child's behalf, or he may seek to obtain inheritance rights through the child should the child predecease him. In all of these situations the consequences of the determination of paternity are considerable. Yet because one of the parents is deceased, the risk of an inaccurate determination of paternity is heightened. Because the consequences of a paternity determination are so far reaching and because such a determination is final and the consequences of determining the relationship are permanent, the court must be reasonably certain that its decision is accurate. *Corra v. Coll*, 305 Pa.Super. 179, 451 A.2d 480 (1982). Therefore, we hold that when one of the parents of a child born out of wedlock is deceased, and only after the parent's death is the issue of paternity raised, the one claiming paternity must prove the relationship by clear and convincing evidence.

Because the trial court did not clarify what standard of proof it applied to appellee's claim of paternity, we must remand to the trial court for proper application of the clear and convincing burden of proof to the evidence which was presented. *See: Adoption of T.N.J. and K.M.J.*, 321 Pa.Super. 355, 468 A.2d 517 (1983) (case remanded when clear and convincing standard of evidence for involuntary termination of parental rights was pending on appeal at time trial court decided case.)

On remand, the issue of the significance of the HLA blood testing which was requested by appellee, ordered by the court, and submitted to by no one will be relevant. The Statute provides that blood tests can be conclusive as to non-paternity, 42 Pa.C.S. § 6136, and case law provides that HLA blood tests are admissible as *some* evidence of paternity, but are not conclusive. *Olson v. Dietz,* 347 Pa.Superior Ct. 1, 500 A.2d 125 (1985); *Connell v. Connell,* 329 Pa. Super. 1, 477 A.2d 872 (1984); *Turek v. Hardy,* 312 Pa.Super. 158, 458 A.2d 562 (1983).

Appellee requested that the court order HLA blood testing for the parents of Sherry, Franklin A. and Rhoda Milliken, the brother of Sherry, Frank J. Milliken, and the two children whose paternity is in question. In support of the motion requesting the blood testing, appellee attached an affidavit of Dr. Ryals setting forth his credentials in the field of parentage testing and the fact that "testing a deceased mother's parents and her sibling provides sufficient data to reliably infer the decedent's phenotypes (blood-types)." Affidavit of Dr. Ryals, ¶ 9. Based on the motion and supporting affidavit, the court ordered HLA blood testing for Franklin A. and Rhoda Milliken, Frank J. Milliken, Jeremiah and Miranda Fornell, and appellee. Franklin A., Rhoda, and Frank J. Milliken refused to submit to blood testing. Therefore, the trial court noted in its opinion that the lack of scientific evidence in the record hampered a conclusive determination of paternity. (Opinion of House, J., November 6, 1984 at 4.)

Although on remand we could direct the trial court to enforce its order for HLA blood testing, and then, applying the appropriate burden of proof, to determine whether appellee is the father, we see no reason to do so for two reasons: 1) the relationship of Franklin A., Rhoda, and Frank J. Milliken to Sherry Fornell renders the blood tests of Rhoda, Franklin A., and Frank J. inconclusive as to the blood types of Sherry; and 2) appellee, despite his request for blood testing, himself failed to submit to blood tests

when ordered even though he seeks to establish himself as the father.

Appellee's motion for blood testing recites that Rhoda and Franklin A. Milliken are Sherry Fornell's parents and that Frank J. Milliken is her brother. The testimony, however, demonstrates that the paternity of both Sherry Fornell and Frank J. Milliken is uncertain. Both Sherry and Frank J. were born to Rhoda Milliken while Rhoda was married to her first husband, but while Franklin A. Milliken was "boarding" with her. (N.T., August 2, 1984 at 78.) After Rhoda finally obtained a divorce, she and Franklin A. were married and Franklin A. subsequently adopted Sherry and Frank J. (N.T., August 2, 1984 a 78.) Thus, Franklin A. is the adoptive father of Sherry and samples of his blood could provide no clues as to the components of Sherry's blood. Similarly, Frank J.'s blood could only affirmatively show, if anything, what blood types Sherry acquired from her mother, their only known common ancestor. But this information could be obtained more easily by simply testing only Rhoda's blood.

The affidavit of Dr. Ryals provides that the HLA blood test can resolve disputed paternity cases when the natural mother is dead "provided first degree kin are available for a family study.... Inferences based on family study are reliable since one-half of the decedent's genotype is transmitted by each of the decedent's parents." Affidavit of Dr. Ryals, ¶ ¶ 8, 10. Dr. Ryal's affidavit does not say that HLA blood testing can provide any significant evidence of paternity if only the blood of the decedent's mother is available for testing.

A child receives 50% of his blood types from each parent. Affidavit of Dr. Ryals, ¶ 10; Lake and Paulsen, *From Here To Paternity,* Family Advocate, vol. 8, No. 1, Summer, 1985, p. 41. Because the only clearly identifiable first degree kin of the whole blood of Sherry is her mother, if the blood test order had been complied with in this case, the court could only determine one-half of the blood types of Sherry. There is only a 50% chance that the known possible

blood types of Sherry which she inherited from her mother, Rhoda, were passed on to either Jeremiah or Miranda. If Jeremiah and Miranda each received from Sherry that blood type which Sherry had received from her mother, we could determine which blood types the natural father of the children *must* have. But if Jeremiah and Miranda each received from Sherry that blood type which Sherry had received from her father, whose identity we do not know, we could not determine which blood types Miranda and Jeremiah *must* have received from their natural father, but only ones they *might* have received. We conclude that because blood tests could trace Sherry's blood through her mother only, and because 50% of Sherry's blood types came from her father, whose identity has not been determined, the testing of Franklin A.'s and Frank J.'s blood would be purposeless, and the testing of Rhoda's blood could only incompletely determine Sherry's blood types.

Appellee could just as accurately have established his paternity of the children by blood testing had *he* complied with the court ordered testing and had himself and the children tested, than had *all* the parties been tested as he requested. His own blood test, unlike those of Rhoda, Franklin A. and Frank J. Milliken, was *essential* to a determination of paternity by blood types.[2] Therefore, if the trial court so desires, it can impose the sanction provided in 42 Pa.C.S. § 6133 and determine the question of paternity against appellee because of his non-compliance with the court order.

**2.** His blood test not only would be essential for any conclusion to be drawn from the blood tests, but possibly only his and not the mother's or her relations' tests would be even *necessary* to make a valid conclusion about paternity. In *La Croix v. Deyo*, 113 Misc.2d 89, 447 N.Y.S.2d 864 (Fam.Ct.1981), a putative father brought an action to establish his paternity of a child born out of wedlock. Although the child's natural mother was dead, as in the case at bar, an HLA blood test was made on *only* the child and the putative father. The court held that the results of these tests were admissible, noting that the expert testifying about the blood test had stated that the mother's death neither precluded the making of the HLA test nor impaired the validity of the conclusions drawn therefrom.

In short our analysis of HLA blood testing that was ordered in this case, leads us to the conclusion that not only would the HLA blood testing of Rhoda, Franklin A., and Frank J. have been inconclusive as to the blood types of Sherry, but appellee, who wanted to establish paternity and could have submitted to blood testing, the result of which would have been admissible as at least some evidence of paternity, never did submit himself to the blood testing. In this case, appellee knew of his right to have a blood test and he refused to do so after appellants refused to submit to the tests. However, his blood test, unlike theirs, could have provided him with the positive identification he needed to establish his case.

The Order, as to Jeremiah, is reversed. The order, as to Miranda, is vacated and the case is remanded for proceedings consistent with this opinion. Jurisdiction is not retained.

WIEAND, J., files a concurring opinion.

SPAETH, Former President Judge, did not participate in the final decision of this case.

WIEAND, Judge, concurring:

Implicit in Judge Rowley's opinion is a recognition that Jerry Williams, who claims that he is the biological father of Jeremiah James Fornell, has standing to obtain an adjudication of his claim even though the child was conceived and born to a woman while she was married to another who is presumed to be the father. This issue has not previously been before the appellate courts of this Commonwealth and, because of the conflicting interests involved, merits consideration.

The courts of this Commonwealth have held that there is a strong presumption that a child born to a married woman is the child of the mother's husband. *Connell v. Connell,* 329 Pa.Super. 1, 6, 477 A.2d 872, 875 (1984). The presumption of legitimacy can be rebutted only by evidence which is clear and convincing. *Burston v. Dodson,* 257 Pa.Super. 1,

11, 390 A.2d 216, 221 (1978). The issue requiring consideration in this appeal, however, is whether the presumption may under any circumstances be rebutted by one who contends that he is the biological father of a child born to a mother during her marriage to another.

This issue focuses upon the conflicting interests of the contending biological father to obtain an adjudication of his paternity claim and of the state to protect the family and the presumed legitimacy of the child. "The Commonwealth," it has been said, "has legitimate and strong interests in 'the strengthening and encouragement of family life for the protection and care of children,' and in affording legitimacy to children." *P.B.C. v. D.H.*, 396 Mass. 68, 73, 483 N.E.2d 1094, 1097 (1985) (citation omitted). Nevertheless, in my judgment, it is not necessary to deny a contending biological father access to the courts in order to preserve the interests of the state. The family relationship and the legitimacy of children born to a married woman can adequately be protected by the strong presumption of legitimacy.

Guarantees of due process and equal protection add weight to the need to allow a contending biological father to litigate his private interest in the children whom allegedly he has sired. *Anonymous v. Anonymous*, 472 So.2d 640 (Ala.Civ.App.1984) (putative father of child born to married woman is entitled to opportunity to present evidence to rebut presumption that mother's husband was father); *In re Lisa R.*, 13 Cal.3d 636, 532 P.2d 123, 119 Cal.Rptr. 475, *cert. denied*, 421 U.S. 1014, 95 S.Ct. 2421, 44 L.Ed.2d 682 (1975) (unwed father has standing to challenge statutory presumption that child of married woman is legitimate issue of marriage where both mother and presumed father are dead and state has custody of child); *R. McG. v. J.W.*, 200 Colo. 345, 615 P.2d 666 (1980) (statute which deprives putative father of access to courts to assert claim of paternity violates principles of equal protection); *Pritz v. Chesnul*, 106 Ill.App.3d 969, 62 Ill.Dec. 605, 436 N.E.2d 631 (1982) (putative father of illegitimate child has constitutional right

to legal forum with due process to establish natural parentage and paternal rights). Cf. *Smith v. Lane,* 101 Misc.2d 615, 421 N.Y.S.2d 786 (1979) (putative father allowed to sue to establish paternity—no discussion of standing); *Rayson v. Gabby,* 57 A.D.2d 437, 395 N.Y.S.2d 290 (1977) (same). See also: *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Contra: *P.B.C. v. D.H., supra; Petitioner F. v. Respondent R.,* 430 A.2d 1075 (Del.1981); *A v. X, Y, and Z,* 641 P.2d 1222 (Wyo.1982).

Although appellee had standing to assert and obtain an adjudication of his claim of paternity, I agree with Judge Rowley that the evidence of appellee's paternity was inadequate as a matter of law to overcome the presumption that Jeremiah was the legitimate son of his mother and his mother's husband. Therefore, I agree that the trial court's award of Jeremiah's custody to appellee should be reversed.

I also agree with Judge Rowley that a remand is necessary to permit the trial court to apply a "clear and convincing" standard regarding appellee's evidence that he is the biological father of Miranda.