390 A.2d 216

**Paul BURSTON**

v.

**Louise DODSON, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 8, 1976.

Decided July 12, 1978.

2

A. Benjamin Johnson, Jr., Philadelphia, for appellant.
Ronald J. Brockington, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This appeal concerns the custody of a child, Patasha Mosley. The lower court found that appellee is Patasha's natural father and awarded him custody. Since the evi-

4

dence makes it overwhelmingly clear that appellee is Patasha's father, the order of the lower court is affirmed.

—1—

Appellee first met Carrie Mosley during the winter of 1969, when Ms. Mosley opened a delicatessen a few doors from appellee's seafood and fruit store. (N.T. 2/26/75, 19, 39) Ms. Mosley had separated from her husband in 1963, and was living with her two children and a boyfriend. (N.T. 2/26/75, 19–20) When her relationship with this boyfriend came to an end, during the spring of 1971 (N.T. 2/26/75, 20–21), her relationship with appellee became more serious.[1] In October 1971 appellee helped Ms. Mosley buy a house on Hemburger Street. (N.T. 2/26/75, 21) Appellee had keys to the house and visited her both day and night. (N.T. 2/26/75, 22, 42)[2] Further, appellee helped support Ms. Mosley and her two children. (N.T. 2/26/75, 21)[3] However, appellee did not live with Ms. Mosley because he was married and lived with his wife. (N.T. 2/26/75, 28–29)

On February 27, 1973, Ms. Mosley gave birth to Patasha. Appellee visited them at the hospital (N.T. 2/26/75, 46), and brought them home from the hospital. (N.T. 2/26/75, 47) He also took them back to the hospital for physical checkups, and he provided money for Patasha's care. (N.T. 2/26/75, 32)[4]

1. Even before her breakup with her boyfriend there was evidence of a serious relationship between appellee and Ms. Mosley. Appellee testified that "after the first year, while Carrie was in this business, I began to take over the responsibilities of the business." (N.T. 2/26/75, 20) He made sure that she had the proper amount of money in the register to carry her . . . through the day." (Id.)

2. Appellee testified that the house was only a 3 or 4 minute drive from his place of business (N.T. 2/26/75, 26–27), and that he "was there every morning and every night after I closed the store." (N.T. 2/26/75, 42)

3. Ms. Mosley closed her delicatessen shortly before her breakup with her boyfriend. (N.T. 2/26/75, 43) From that time until her death she was receiving state welfare. (N.T. 2/26/75, 21, 32)

4. Because Ms. Mosley was on welfare the state paid the hospital bill. (N.T. 2/26/75, 72–73)

On December 1, 1973, Ms. Mosley became ill and appellee took her to Temple Hospital. (N.T. 2/26/75, 23) Patasha and the two older children were taken to the home of appellant as their maternal grandmother. (N.T. 2/26/75, 48–49) On December 23, 1973, while appellee was present, Ms. Mosley died. (N.T. 2/26/75, 22) Appellee paid a large part of her funeral expenses.[5]

In January 1974, when going through Ms. Mosley's papers, appellee discovered Patasha's birth certificate. (N.T. 2/26/75, 36, 52) The birth certificate listed Ms. Mosley's husband as the father. (N.T. 2/26/75, 18) This was a shock to appellee since he had expected Ms. Mosley to place a fictitious name on the certificate. (N.T. 2/26/75, 50–51) He immediately went to see appellant to point out the error. (N.T. 2/26/75, 52–53) In February, just before instituting this action, appellee told appellant that he wanted to have the father's name on the birth certificate changed to his name. (N.T. 2/26/75, 49–50) She refused, asserting that "[her daughter] left it like that and that's the way I am going to leave it." (N.T. 2/26/75, 50)

Appellant did not, however, contradict appellee's claim that he is Patasha's father. Indeed, in many respects appellant corroborated appellee's testimony. It had been her belief that appellee was helping her daughter financially. (N.T. 2/26/75, 67) She admitted that when she visited her daughter's home, sometimes appellee was there (N.T. 2/26/75, 69–71), and that on occasion her daughter and appellee would visit her together (N.T. 2/26/75, 71). Further appellant testified that appellee took her daughter to the hospital, and also that he took her there to visit her daughter. (N.T. 2/26/75, 55, 74) Appellant also stated that appellee attended the funeral. (N.T. 2/26/75, 77) Appellant did dispute the fact that appellee had helped her

5. On cross-examination appellant asserted that she paid all of the funeral expenses, totalling $1100. (N.T. 2/26/75, 77, 79) However, the lower court in its opinion notes that appellee submitted to the court a photostatic copy of a cancelled check for $478.02 payable to a Philadelphia mortician in part payment of the funeral expenses for Ms. Mosley. Slip Opinion at 3.

6

daughter make a downpayment on her house. Instead she asserted that her daughter had come to her for assistance, and she had given her $300. (N.T. 2/26/75, 64–66) This testimony, however, was discredited by the fact that the branch bank from which she allegedly withdrew the money did not exist. (N.T. 2/26/75, 75–76) When specifically questioned regarding Patasha's paternity, appellant was evasive (N.T. 2/26/75, 68–69),[6] as she was also regarding the length of her daughter's separation from her husband (N.T. 2/26/75, 67–69). However, appellant confirmed appellee's testimony regarding her response to his request that the father's name on the birth certificate be changed (N.T. 2/26/75, 74).[7]

The birth certificate indicated that Patasha was a full term baby. (N.T. 2/26/75, 18) Therefore, conception was during May or early June of 1972. Appellee attempted to prove that Thomas Mosley, Carrie Mosley's husband, could not have had access to his wife during the period of conception because he was in prison. However, a prison agent testified that the first record of Mosley's contact with the prison system for the particular offense in question was on

6. On direct examination appellant testified:
 Q. Did you ever talk about who was the father of the child?
 A. No, we didn't.
 Q. She never said anything to you about Mr. Burston [appellee] or Mr. Mosley?
 A. She never told me he was the father.
 THE COURT: She never told you who the father was?
 THE WITNESS: Mr. Burston.
 THE COURT: No. She never told you who the father was?
 THE WITNESS: No, she didn't.
 THE COURT: Did she have to?
 THE WITNESS: I guess not.
 THE COURT: You knew who the father was; didn't you?
 THE WITNESS: Well, I didn't really know.
 THE COURT: Who did you think was the father?
 THE WITNESS: Well, I don't know. I couldn't really definitely say.
 THE COURT: I didn't ask you to definitely say. Well, you don't have to answer that if you don't want to.
 N.T. 2/26/75, 56–57.

7. Also in this regard, the lower court believed appellee's testimony that appellant was aware of the plan to use a fictitious name on the birth certificate. Slip Opinion at 2. (N.T. 2/26/75, 50–51)

June 19, 1972, when Mosley was received at the Philadelphia Detention Center. (N.T. 2/26/75, 60, 63) Accordingly, access was not precluded. Mosley himself testified on behalf of appellant that in June, before he was incarcerated on the 19th, he had twice had intimate relations with his wife at his mother's house. (N.T. 11/17/75, 5–6) He also testified that Patasha was his child. (N.T. 11/17/75, 4) Appellant attempted to corroborate this testimony by introducing the testimony of Lillian Lane, appellant's daughter and Ms. Mosley's sister:

Q. When is the last time that you ever saw your deceased sister and her husband together?

A. The last time that I knew—

THE COURT: No. We didn't ask you the last time you knew. When was the last time you saw them together?

THE WITNESS: When we took her up there.

THE COURT: Took her up where, to prison?

THE WITNESS: No, at his house.

THE COURT: What was the occasion for taking her to his house?

THE WITNESS: She asked me to drop her off.

BY MR. JOHNSON:

Q. When was that? What year was that?

A. What year?

Q. Yes.

A. I guess that must have been about three years ago now.

THE COURT: Is that the best recollection you have, about three years ago?

THE WITNESS: Yes, I do.

N.T. 11/17/75, 48–49.

The lower court did not believe either Mosley's testimony or Lillian Lane's, but found "without reservation that the testimony of Thomas Mosley on the issue of access is patently false and totally unworthy of belief. The testimony of

Lillian Lane . . . on the issue is absolutely worthless." Slip Opinion at 5. The correctness of this finding is evident. Lillian Lane's testimony has been quoted above, and it is indeed worthless. As for Mosley's: On cross examination, Mosley indicated no familiarity or involvement with his wife and children. Since 1963 he and his wife had not lived together. (N.T. 11/17/75, 36) [8] He had never gone to visit her at her house on Hemburger Street. (N.T. 11/17/75, 9–10, 39–40) Although he was released from prison in December of 1973 (N.T. 11/17/75, 13), he had gone to visit her in the hospital. (N.T. 11/17/75, 21) He also did not know the name of the hospital she had been in or the date of her death. (Id.) While he was in prison, he had not been informed by his wife of Patasha's birth. (N.T. 11/17/75, 7) He did not know the date of Patasha's birth (id.), and he was uncertain of her age. (N.T. 11/17/75, 22) Further, when questioned by the court, he was unable to give Patasha's full name. (N.T. 11/17/75, 22) Despite his assertion that while in prison he had been informed by someone else of Patasha's birth (N.T. 11/17/75, 7), he did not indicate Patasha's existence to parole authorities:

Q. At the time that you left the jail, did you have an interview with the parole authorities?

A. Yes.

Q. And did you indicate to them how many children you had.

A. Yes.

Q. And what did you tell the parole authorities as to the number of children you had?

A. Two [i. e., not including Patasha, who would have been his third child].

N.T. 11/17/75, 34.

Even after his wife's death, Mosley indicated no willingness or interest in assuming parental responsibility for the care of his children:

8. In addition to the testimony already mentioned, Mosley gave further testimony on access, to the effect that although he had been separated from his wife since 1963, "we were never what you would call totally apart. I was always seeing her." (N.T. 11/17/75, 41–44)

Q. Are you supporting any of the children born to Mrs. Mosley?

A. I go to school.

THE COURT: Just answer the question yes or no.

A. No, I can't afford to.

Q. When did you last support your children?

A. When did I last support them?

Q. Yes.

A. What do you mean, like—

Q. When did you last give money for their support?

A. I have never given money for their support. I always had taken them out and bought them things myself.

N.T. 11/17/75, 18.

His failure to assume parental responsibility was particularly pointed in regards to Patasha:

Q. Who made the decision that Patasha was to remain with Mrs. Dodson?

A. Who made the decision?

Q. That's correct.

A. As far as I'm concerned, she can stay with her.

Q. I didn't ask you that. I said who made the decision that Patasha was to stay with Mrs. Dodson?

A. On, no one just made the decision, no particular person.

N.T. 11/17/75, 25.

 Also, appellee introduced evidence of prior statements by Mosley, inconsistent with his testimony that he was Patasha's father. The statement to the parole authorities has been mentioned. In addition, the Department of Public Welfare case worker's summary on Mosley's application for public assistance showed that on July 31, 1974, Mosley claimed only two children, "Joann, age 11 and Amanda, age 13, who are living with their grandmother, Louise Dodson [appellant] . . . ." (N.T. 12/15/75, 13–14)[9]

9. Appellant argues that this statement was inadmissible as it violated the rule that neither a husband or a wife can testify as to non-access. However, as noted by the lower court, this evidentiary rule has been

10

This statement was made almost a year and a half after Patasha's birth.[10]

–2–

 From the foregoing it will be seen that as a matter of common sense the case presents not the least difficulty. Nothing reveals the truth so clearly as the parties' conduct before there was any thought of a law suit. As to this conduct, the evidence is overwhelming, and indeed unrebutted. Thomas Mosley has consistently acted as though he were *not* Patasha's father, appellee, as though he were. The dissent, however, citing *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951), contends that we must nevertheless rule against appellee because of a "presumption" of legitimacy that can only be overcome by "evidence of non-access or lack of sexual intercourse or impotency [that is] clear, direct, convincing and unanswerable (citation omitted) although it is not necessary that the possibility of access be completely excluded (citation omitted)." Dissenting Opinion at 224. However, a careful review of the law will show that appellee's evidence is ample to prove that he is Patasha's father. In fact, rather than contradicting this conclusion *Cairgle* supports it.

specifically overruled by this court. *Commonwealth ex rel. Savruk v. Derby*, 235 Pa.Super. 560, 344 A.2d 624 (1975). The statement was therefore properly admitted.

10. Appellee also attempted to prove he was Patasha's father by blood tests. Tests were conducted on his blood and Patasha's. Results from prenatal and delivery blood tests taken from Carrie Mosley were also available to the hematologist. However, appellant along with Carrie Mosley's two older daughters and Thomas Mosley refused to submit to testing on the advice of counsel. On the basis of the tests performed the hematologist was only able to testify that appellee "cannot be excluded as the father of this child." (N.T. 2/26/75 at 12) The lower court was not permitted by the Act of July 13, 1961, P.L. 587, 28 P.S. 307.1, to rely on Thomas Mosley's failure to submit to blood tests in determining Patasha's paternity. Since Thomas Mosley was a husband with possible access to his wife he must be considered the "presumed father," and not the "alleged father" as defined in the Act. This conclusion, however, is of no importance, since the affirmative evidence of paternity is so compelling.

*Cairgle* was a compensation case. James Cairgle died of silicosis on April 30, 1948, leaving a widow, Elizabeth Cairgle, from whom he had been separated since 1932. Following the separation, Elizabeth had had three children, and the issue was whether James was the children's father or whether one Harry Owens was. Claiming that James was the father, Elizabeth filed for compensation benefits for the children. The Workmen's Compensation Board, the County Court, and this court, disallowed the claim on the basis that the children were not James Cairgle's but Harry Owens's, and so were illegitimate. On further appeal, the Supreme Court affirmed.

Elizabeth testified that despite her separation from James she had continued to see him from time to time and had had intercourse with him. In this testimony she was corroborated by the testimony of a daughter and of a son. On the basis of this testimony Elizabeth

> contended that the three minor children must be considered legitimate because of the exceptionally strong presumption of legitimacy and the fact that defendant [*i. e.*, James Cairgle's employer] had failed to prove non-access; whereas claimant's [Elizabeth's] testimony, supported by a daughter and son, as above set forth, proved access; and, therefore, under the law the children must have been legitimate.

> *Id.*, 366 Pa. at 253, 77 A.2d at 441.

In appraising Elizabeth's contention the Supreme Court first collected cases regarding the presumption of legitimacy, stating:

> In order to successfully rebut the presumption of legitimacy, the evidence of non-access or lack of sexual intercourse must be clear, direct, and convincing and unanswerable [citations], although it is not necessary that the possibility of access be completely excluded [citations].

> *Id.*, 366 Pa. at 256, 77 A.2d at 442.

Thus, it would be incorrect to state that the rebuttal evidence must be "clear, direct, convincing and *unanswerable.*" To be correct, one must add the clause, "although it is *not*

*necessary* that the possibility of access be *completely excluded.*" In other words: "unanswerable" must not, indeed cannot, be read literally, for to be "unanswerable," the possibility of access *would* have to be "completely excluded." This would impose a greater burden of proof than required in a criminal proceeding. Instead, "unanswerable" must be read as meaning "exceedingly strong" or "overwhelming," *i. e.*, more than proof that is clear and convincing but not so much more as to exclude every possibility.

The correctness of this conclusion is apparent both from the Supreme Court's discussion of the evidence in *Cairgle*, and from its decision. If "unanswerable" were to be read literally, the Court would have decided in Elizabeth's favor, and have found the children legitimate, for the possibility of James's access to Elizabeth had *not* been completely excluded. Instead, however, the Court found against Elizabeth. The Court conceded that Elizabeth's evidence of access was both corroborated and uncontradicted. However, the Court added, uncontradicted testimony need not be accepted as true, and furthermore, the referee's findings of fact should be accepted unless capricious. *Id.*, 366 Pa. at 252, 77 A.2d 440. The referee's findings were not capricious; to the contrary, the evidence against Elizabeth was exceedingly strong. Probably the strongest of this evidence was that Elizabeth had named each child after Owens. Elizabeth explained this by saying that she did "because I wasn't living with my husband. That is why Owens had to be the name . . . ." *Id.*, 366 Pa. at 253, 77 A.2d at 441. The referee, however, did not believe her, nor did he believe other testimony by her, and by her son and daughter, for just as is so in the case before us, the testimony was belied by the parties' conduct: the children lived with Owens, not James Cairgle, and Owens supported them, not Cairgle. *Id.*, 366 Pa. at 258, 77 A.2d 439.

These facts [said the Supreme Court], supported as they were *by the overwhelming weight of what the referee and the Board found was the credible evidence* in the case, were sufficient to overcome and rebut the presumption of

legitimacy, even though claimant occasionally saw her husband at his house in the presence of Estelle [the husband's witness] commencing in 1942, or met him a few times at a tea room in months and years unmentioned. *Id.*, 366 Pa. at 258, 77 A.2d at 443. (Emphasis added)

■ Thus, in summary, it will be seen that the facts of *Cairgle* and of the present case are substantially the same. In both cases the mother and husband had been separated for a long period of time. During this period of time the mother was living with or was on intimate terms with another man, and conception of the child (children) took place. The other man provided support for the mother and child (children). And finally, the fact finder found the credible evidence sufficient to rebut the presumption of legitimacy, despite testimony of access. In reviewing these facts, the Court in *Cairgle* made it clear that the presumption of legitimacy will not survive a challenge simply because *some evidence* of access is offered. If the fact finder *believes* the evidence of access, the presumption of legitimacy becomes irrefutable. If, however, the fact finder does *not* believe the evidence of access, even though the evidence is uncontradicted, the presumption of legitimacy is susceptible to attack; and if the evidence of *il*legitimacy is of "overwhelming weight," it will be found "sufficient to overcome and rebut the presumption of legitimacy." *Id.*, 366 Pa. at 258, 77 A.2d at 443.

This is also the rule established by our own decisions. Thus in *Commonwealth v. Fletcher*, 202 Pa.Super. 65, 68–69, 195 A.2d 177, 178 (1963), we stated:

The presumption of legitimacy stands until met with evidence which makes it clearly appear that the husband was not the father of the child: *Commonwealth v. Carrasquilla*, 191 Pa.Super. 14, 155 A.2d 473. However, in the words of Judge Cunningham in *Commonwealth v. Levandowski*, 134 Pa.Super. 477, 4 A.2d 201, appellant's "proposition that the Commonwealth was not entitled to have this case submitted to the jury if there was a possibility of access, no matter how remote, is no longer the law. In

the colorful language of Mr. Justice Cardozo . . .
the 'rule of the four seas' was 'exploded' two centuries
ago. The modern rule . . . is that 'countervailing
evidence may shatter the presumption [of legitimacy]
though the possibility of access is not susceptible of exclu-
sion to the point of utter demonstration'. Legitimacy is
not to be sustained 'by a sacrifice of probabilities in a
futile quest for certainty' "

*And see Commonwealth v. Ludlow*, 206 Pa.Super. 464, 214
A.2d 282 (1965); *Commonwealth v. Levandowski*, 134 Pa.Su-
per. 477, 4 A.2d 201 (1939). *Cf. Commonwealth v. DiBona-
venture*, 206 Pa.Super. 340, 213 A.2d 175 (1965); *Common-
wealth v. Carrasquilla, supra*, (evidence insufficient to rebut
presumption).

–3–

██ By applying the foregoing cases here, the proper
decision is readily reached. The lower court specifically
rejected the testimony of Thomas Mosley and Lillian Lane
on the issue of access as unbelievable, and specifically ac-
cepted appellee's evidence. We have repeatedly held that
we must defer to a lower court's appraisal of the witnesses'
credibility. *Commonwealth ex rel. Tobias v. Tobias*, 248
Pa.Super. 168, 344 A.2d 1372 (1977). *In the Interest of
Clouse*, 244 Pa.Super. 396, 403, 368 A.2d 780, 782 (1976);
*Clair Appeal*, 219 Pa.Super. 436, 437, 281 A.2d 726, (1971).
*Accord: Commonwealth ex rel. Doberstein v. Doberstein*,
201 Pa.Super. 102, 192 A.2d 154 (1963); *Commonwealth ex
rel. Dinsmore v. Dinsmore*, 198 Pa.Super. 480, 182 A.2d 66
(1962). Here, moreover, the printed record alone confirms
the lower court's appraisal. Thomas Mosley's testimony was
replete with inaccuracies and improbabilities, and he pos-
sessed only the sketchiest information regarding his wife,
from whom he had been separated for ten years before
Patasha's birth. In contrast, appellee introduced over-
whelming evidence that he was Patasha's father. He was
Ms. Mosley's paramour when Patasha was conceived. He
helped to support Ms. Mosley and her children, and was
involved with her family on a daily basis. He took her to

the hospital when she became ill, and was with her when she died. There is no doubt that their relationship was an intimate one. On this record, we must conclude that the evidence was sufficient to overcome the presumption of legitimacy, and that appellee was Patasha's father. *Cairgle v. American Radiator and Standard Sanitary Corp., supra. Accord: Commonwealth v. Ludlow, supra; Commonwealth v. Fletcher, supra; Commonwealth v. Levandowski, supra.*

–4–

 The only remaining question is whether the lower court was correct in awarding custody of Patasha to appellee.

Appellant argues that it was not in the best interest of Patasha to award custody of her to appellee. In considering the issue of custody the lower court stated in its opinion:

Whether a child is considered legitimate or illegitimate; whether the petitioning party is mother or father, parent or grandparent the controlling principle is the best interest of the minor child. Thus our primary concern must be not the desire of the grandmother, the wishes of the deceased mother or any "right" of the father, but the welfare of the child . . . . We must, therefore, determine if the transfer of the custody of Patasha from the maternal grandmother to natural father is in Patasha's best interest.

Slip Opinion at 9–10.

The lower court then went on to balance the advantages of the two homes and concluded that it was in Patasha's best interest that custody of her be awarded to appellee.

We agree with this conclusion, and only note that in reaching it the lower court applied a stricter standard than should have been applied. In *In re Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977), we stated:

When the judge is hearing a [custody] dispute between the parents, or a parent, and a third party, the manner of inquiry is more complex. The question still is, What is in the child's best interest? However, the parties do not

> start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first hear all evidence relevant to the child's best interest, and then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.
>
> 249 Pa.Super. at 286, 376 A.2d at 654.

Therefore, having found that appellee is Patasha's father, the lower court should not have simply balanced the advantages of the two homes; rather, appellant as Patasha's grandmother should have been required to show convincing reasons why appellee should not have custody of Patasha. Here, however, this error is immaterial; its only result was to impose on appellee a heavier burden than should have been imposed.

The order of the lower court is affirmed.

VAN der VOORT, J., files a dissenting opinion in which JACOBS, President Judge, joins.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

VAN der VOORT, Judge, dissenting:

I respectfully dissent from the Opinion of the Majority for the reason that I do not agree that the appellant met the burden of rebutting the presumption of legitimacy. Consequently I would return the child to the custody of her grandmother, who is the appellant in this case.

On February 27, 1973, Carrie Mosley gave birth to Patasha Mosley following a full term pregnancy. At the time of Patasha's birth, Carrie was married to Thomas Mosley although the two were not residing together. Approximately nine months after Patasha was born she found herself motherless due to the untimely death of Carrie. Patasha immediately went to live with her maternal grandmother,

Louise Dodson, where she resided until the time of the initial hearing on the petition of Paul Burston, appellee, seeking custody of her.

Appellee filed a Petition for Writ of Habeas Corpus on April 19, 1974 alleging, inter alia, that he was the natural father of the child in question and the home of appellant was not suitable for the child's development and well-being. The initial hearing was held on February 26, 1975 and two subsequent hearings were held on November 17, 1975 and December 15, 1975. On May 27, 1976, the court issued an order whereby it was determined that Paul Burston was the natural father of Patasha Mosley and that he be granted custody of her. From that order, Louise Dodson filed this appeal.

Appellant's primary contention is that the evidence was insufficient to establish that Paul Burston was the natural father of Patasha Mosley. Undoubtedly, the law favors the legitimacy of children and consequently there is a very strong presumption that a child born of a married woman is the daughter of the husband. In *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951), the court stated on page 255, 77 A.2d on page 442:

The presumption of legitimacy is, however, still one of the strongest known to the law and can be overcome only by proof of facts establishing non-access or that the husband was impotent or had no sexual intercourse with his wife at any time when it was possible in the course of nature for the child to have been begotten: *Dennison v. Page*, 29 Pa. 420, 422, *Dulsky v. Susquehanna Collieries Co.*, 116 Pa.Super. 520, 525, 177 A. 60; *Jane's Estate*, 147 Pa. 527, 530, 23 A. 892. This is the modern rule.

Although the court in *Cairgle* eventually held that the presumption was overcome by the evidence, I do not find that the evidence in the present case was sufficient to overcome the presumption.

There can be no denying that appellee and Patasha's mother were very close when she was living. He assisted her in buying a house and running her business. He was

also involved with helping Patasha's mother prior to birth and subsequently. There was evidence that appellant paid part of the funeral expenses incurred in the burial of Patasha's mother. This all presented a picture of deep affection on the part of appellee for Carrie Mosley. However, the evidence that Thomas Mosley, the husband of Carrie at the time of Patasha's birth, was the natural father was also convincing. Initially, the birth certificate of Patasha listed Thomas Mosley as the father and there was never any attempt on the part of Carrie Mosley to change it. Appellant attempted to establish that Thomas Mosley could not be the father because of lack of access. However, the testimony indicated that Thomas Mosley was incarcerated, but not until the middle of June; whereas the time of conception was determined to have occurred in late May or early June. Furthermore, Thomas Mosley took the witness stand and testified that he continued to see his wife even though they were no longer residing together. He stated that on a couple of occasions he had intimate relations with her at his mother's home in June, just prior to his incarceration.

Although the presumption of legitimacy is very strong it is not absolute. The court stated in *Cairgle, supra,* 366 Pa. at page 256, 77 A.2d at page 442:

In order to successfully rebut the presumption of legitimacy, the evidence of non-access or lack of sexual intercourse or impotency must be clear, direct convincing and unanswerable (citation omitted) although it is not necessary that the possibility of access be completely excluded (citation omitted).

In the present case, we have a situation where the husband not only had access to his wife, but testified that he was intimate with her on two different occasions. Although the lower court elected to discredit this testimony entirely, I cannot do so. The very strong presumption of legitimacy coupled with the husband's direct testimony clearly establishes Thomas Mosley's paternity of Patasha.

The second issue raised by appellant concerns the custody of Patasha. The well established rule in Pennsylvania re-

garding custody cases is that paramount concern must be given to what would be in the child's best interest. *Auman v. Eash*, 228 Pa.Super. 242, 323 A.2d 94 (1974); *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972). In the present case, the Majority held that the child should be placed in the custody of appellee following a review of the advantages of the two homes and a determination that appellee had a greater right to custody since he was the natural father. However, since I cannot agree with the conclusion that appellee is the natural father, I find that the balance tips in favor of Patasha being placed in the custody of her grandmother. Of great concern to me is the fact that Patasha will be separated from her sisters if placed with appellee. She will be entering a home where she is a stranger. She will be raised by a surrogate mother who possibly could look at her as a constant reminder of her husband's infidelity. The facts of the case clearly present a situation where Patasha should be raised by her grandmother in the home with her blood relatives. I would therefore reverse the order of the lower court and place Patasha with appellant.

JACOBS, President Judge, joins in this Dissenting Opinion.