571 A.2d 1380

**JOHN M., Appellee,**

v.

**PAULA T. and Michael T., Appellants.**

Supreme Court of Pennsylvania.

Argued Dec. 12, 1989.

Decided March 19, 1990.

Scott D. Galloway, Media, for Michael T.

Chester P. Confer, Media, for Paula T.

Steven B. Moss, Media, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

OPINION OF THE COURT *

LARSEN, Justice.

This appeal stems from a Petition for Custody and/or Visitation filed by John M., the appellee, wherein he sought to establish that he is the biological father of a girl-child born to Paula T. while she was married to Michael T., and wherein appellee sought to compel Michael T. to submit to Human Leukocyte Antigen (HLA) blood tests against his will. The issue presented is whether the trial court erred in refusing to order the husband to submit to such tests upon appellee's Motion for Physical Examination pursuant to Pa.R.Civ.P. 4010(a).

Appellee John M. (the "putative father") and appellant Paula T. (the mother) became lovers at a time when the latter was engaged to marry appellant Michael T. (the "presumptive father"). Her relationship with appellee temporarily ceased in August, 1978, and Paula was married to Michael in September, 1978. Paula and Michael have lived together and have remained married since then.

In March, 1979, however, John and Paula resumed their relationship. This relationship continued, on and off, until September, 1983 when it was finally terminated by Paula.

Throughout their marriage, Paula and Michael have lived together and have engaged in sexual intercourse on a regular and frequent basis. On June 6, 1980, Paula gave birth to the couple's first child (whose paternity is not at issue). In January–February, 1981, John and Paula engaged in sexual intercourse on several occasions without

---

* I agree with the views expressed in Mr. Chief Justice Nix's concurring opinion and join in that opinion. The holding of this majority opinion is confined to the precise issues raised by the parties herein.

birth control precautions. During that same period, Paula and her husband, Michael, were also engaging in sexual intercourse regularly, about three to four times a week.

On November 3, 1981, Paula gave birth to her second child, the child whose paternity is at issue (hereinafter referred to as "the Child"). Her husband Michael was in the delivery room and assisted in the Child's delivery. Subsequently, Paula gave birth to two additional children to Michael (a girl and a boy), and these six (Paula, Michael, and their four children) have lived together continuously and have always presented themselves to the community as a family.

There was conflicting testimony at the trial regarding John's attempts to establish and develop a relationship with the Child. Essentially, John claimed to have visited mother and the Child at the hospital upon the Child's birth, and to have kept up a relationship with the Child and her mother. John also testified that Paula had acknowledged to him that he was the Child's father, and that he had offered to support the Child, which offer was refused because Paula would have been unable to explain the source of the support money to her husband. John established a trust fund for the Child; however, at oral argument it was conceded that the trust was revocable at the will of the donor-John.

Paula admitted that she and John had sexual relations until December, 1981 (specifically including January–February of that year), that she remained friends with John until September, 1983, during which time John occasionally visited her and her daughters, but she did not recall ever having indicated to John that he was the Child's father.

Sometime in 1984, Paula refused to allow appellee to visit her and the Child. At appellee's insistence, Paula agreed to submit to a blood test, and HLA blood testing was done on mother, the Child and appellee in December 1984. The results of the HLA blood tests, according to Dr. Sherwood, appellee's expert witness, a hematologist, were that "the probability of paternity ... in this case was 97.47 percent. That is to say [appellee] is 97 percent more likely to be the

true father of the Child than as a random man of the same race." Notes of testimony (N.T.) March 4, 1986, at 114. Dr. Sherwood also expressed his findings as showing that appellee was "38 times more likely to provide that assortment of obligatory genes as is any random man." *Id.* Dr. Sherwood admitted, however, that science can only give an assessment of probability that a particular person is the biological father and that "we cannot say with definitiveness that he is in truth the true father." *Id.* Dr. Sherwood further testified that "in our experience this [97.47 percent probability] is perhaps in the mid range of results that one gets in this type of testing." *Id.* at 115. Michael declined to submit to a blood grouping test to determine the scientific probability of his being the Child's biological father.

Appellee filed a petition and amended petition against appellants seeking partial custody and/or visitation of the Child wherein appellee alleged that he was her father. On December 17, 1985, appellee filed a Motion for Physical Examination pursuant to Pa.R.Civ.P. 4010(a) wherein he sought a court order to compel Michael T. to submit to blood testing, including HLA blood grouping tests. Said motion was denied pretrial by the Honorable Melvin G. Levy of the Court of Common Pleas of Delaware County, and was again denied at trial on March 4, 1986 by the Honorable Robert A. Wright. N.T. *id.* at 10–12.

A hearing was conducted before Judge Wright at which the foregoing facts and testimony were placed upon the record. A final order was issued by Judge Wright on July 29, 1987, which affirmed an earlier order that appellee had not overcome the "presumption of legitimacy" (i.e., the presumption that a child born to a married woman is the child of the marriage—*see* note 2, *infra* ), and that it would be unnecessary therefore to hold any additional hearings regarding visitation. Post-trial motions were filed and denied. In its opinion in support of denial of post-trial motions, the lower court reaffirmed its refusal to compel the appellant-husband to submit to blood tests, and its determi-

nation that appellee had not overcome the "presumption of legitimacy."

John M. appealed to Superior Court which, on August 18, 1988, 377 Pa.Super. 72, 546 A.2d 1162, reversed the lower court, holding that the lower court abused its discretion in refusing to compel Michael T. to submit to blood tests.

This Court granted Paula and Michael T.'s petition for allowance of appeal on February 27, 1989, and we now reverse the Superior Court.

Appellee predicated his motion to compel appellant-husband to submit to a blood test on Rule 4010(a) of the Pennsylvania Rules of Civil Procedure.[1]

Rule 4010(a) provides as follows:

**PHYSICAL AND MENTAL EXAMINATION OF PERSONS**

(a) When the mental or physical condition (including blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, *the court* in which the action is pending *may order the party*

---

**1.** Actually, Rule 4010 does not apply in an action for custody or visitation of minor children. Pa.R.Civ.P. 4001(a)(2). As a general rule, in such actions, there shall be no discovery unless authorized by special order of court. Pa.R.Civ.P. 1915.5(c). However, Rule 1915.-8(a), which is applicable in custody proceedings, provides for "Physical and Mental Examination of Persons," and provides that when the mental or physical condition of a person is in controversy, the court "may order the child or the party to submit to a physical or mental examination by a physician or psychologist or both."

The explanatory note accompanying Rule 1915.8 explains that this rule is "similar to that provided by Discovery Rule 4010." One difference between the rules is that Rule 4010 provides that the court may order such examination "only on motion *for good cause shown,*" whereas Rule 1915.8 does not explicitly contain such "good cause shown" requirement. However, we will analyze the request for court-ordered blood tests in this case under Rule 4010, rather than the more appropriate Rule 1915.8, because appellee specifically made his motion pursuant to Rule 4010 and because the lower court and Superior Court analyzed the motion under Rule 4010. Moreover, the rules are indeed "similar," and we believe that the "good cause shown" requirement which is explicit in Rule 4010 is *implicit* in Rule 1915.8. (*See* explanatory note to Rule 4010, which states: "(2) The amendment introduces a specific requirement of "good cause shown...." Actually, this makes no change in present practice. Good cause and notice were implicit in the prior Rule....")

*to submit to a physical* or mental *examination by a physician* or to produce for examination the person in his custody or legal control. *The order may be made only on motion for good cause shown* and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.

Plainly, Rule 4010(a) authorizes a court to grant a motion for physical examination of a party only "for good cause shown," and places the "good cause" determination at the discretion of the court ("may order the party to submit"). In its opinion denying post-trial motions in this case, the lower court stated:

The Court did not abuse its discretion in refusing to order Husband to take a blood test. The explanatory note to Rule 4010 states "Good cause .. [is] intended to protect parties against undue invasion of their rights to privacy." Where a husband is living with his wife, has never separated from her, is the undisputed father of her first child, was having intercourse with his wife three to four times a week when her second child was conceived, was at the hospital and took part in the delivery of the second child, considers himself to be the natural father of both children and husband, wife and children are living together in the community as a family unit, it certainly is an undue invasion of the husband's right to privacy to order him to take a blood test in proceedings commenced by a person who is alleging that person is the father of the wife's second child.

Slip op. at 13–14.

The lower court's refusal to compel appellant-husband to submit to blood tests was based upon the "presumption of legitimacy,"[2] one of the strongest presumptions known to

2. The "presumption of legitimacy" arose from the reluctance of the law to declare a child "illegitimate," because the status "illegitimate" historically subjected a child so labelled to significant legal and social discrimination. *See, e.g., Michael H. v. Gerald D.,* —— U.S. ——, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); *Commonwealth ex rel. Leider v.*

the law. *Cairgle v. American Radiator Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951); *Minnich v. Rivera*, 509 Pa. 588, 506 A.2d 879 (1986); *Commonwealth ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 136 A.2d 451 (1957). This presumption (which we will henceforth refer to as the presumption that a child born to a married woman was the child of that marriage) could traditionally be overcome only by proof that the husband did not have access to his wife during the period of possible conception, or by proof of the

*Leider*, 434 Pa. 293, 254 A.2d 306 (1969); *Cairgle v. American Radiator Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951); *Estate of Dulles*, 494 Pa. 180, 431 A.2d 208 (1981); Auwers, *Equal Protection and the Illegitimate Child*, 21 Hous.L.Rev. 229 (1984).

In Pennsylvania, however, the General Assembly has eliminated the legal distinction (and discrimination) between "legitimate" and "illegitimate" children. The General Assembly has declared "That *all children shall be legitimate* irrespective of the marital status of their parents and in any and every case where children are born out of wedlock *they shall enjoy all the rights and privileges* as if they had been born during the wedlock of such parents, except as otherwise provided in Title 20 Pa.C.S." Act of June 17, 1971, P.L. 175, No. 17 § 1, *as amended* by Act of November 26, 1978, P.L. 1216, No. 288, 48 Pa.Stat.Ann. § 167 (Purdon's supp.1989). The Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. § 2107, provides that, for purposes of descent, a child born out of wedlock is always a child of the mother, and is a child of the father when the identity of the father has been established in one of three ways: (1) where the parents of a child born out of wedlock shall have married; (2) where the father is "estopped" from denying paternity because of his conduct; and (3) where clear and convincing evidence exists as to who was the father of the child.

Since the legal distinction between "legitimate" and "illegitimate" children has now been eliminated in the Commonwealth by statute, the phrase "presumption of legitimacy" is now meaningless. Thus, this Court will no longer use the phrase "presumption of legitimacy" to describe the "presumption that a child born to a married woman is a child of the marriage," and therefore of the woman's husband. Other jurisdictions have changed their legal nomenclature to eliminate references to "illegitimate" children. *See, e.g.,* California Uniform Parentage Act, 1975 Cal.Stats., ch. 1244, § 13, Cal.Civ.Code Ann. § 7000 *et seq.* (West 1983) (adopting language "presumed to be a child of the marriage"); New York General Construction Laws, Art. 2, § 59 (substituting term "child born out of wedlock" for all references in statutes, ordinances, regulations, judicial proceedings, orders, decrees, etc. to "bastard" or "illegitimate child"); Florida Statutes, Ch. 89–61, Act of June 16, 1989, An act relating to statutory nomenclature to remove references to "illegitimate" children, and substitute "children born out of wedlock"); *Schaffer v. Schaffer*, 187 Conn. 224, 226, 445 A.2d 589 (1982) (judicially adopting terminology/presumption that a child born during wedlock is a child of the husband).

husband's impotency or sterility. *See, e.g., Michael H. v. Gerald D.,* —— U.S. ——, 109 S.Ct. 2333, 2342–43, 105 L.Ed.2d 91 (1989); *Commonwealth ex rel. O'Brien v. O'Brien, supra; Cairgle, supra; Burston v. Dodson,* 257 Pa.Super. 1, 390 A.2d 216 (1978). The trial court correctly held that appellee, the alleged or putative father in this case, had introduced no evidence that would come close to overcoming the presumption that the Child was a child of the marriage under the traditional standards.

Superior Court acknowledged that the presumption that a child born to a married woman is a child of the marriage is an extremely strong one, and can only be overcome by clear and convincing evidence to the contrary. 377 Pa.Super. at 76, 546 A.2d at 1165, citing *Burston v. Dodson, supra* at 11, 390 A.2d at 221. Superior Court also acknowledged that much must be left to the discretion of the court in its determination of "good cause" to compel a person to submit to a physical examination under Rule 4010(a). 377 Pa.Super. at 80, 546 A.2d at 1167. Nevertheless, the Superior Court reversed the lower court, holding that the Uniform Act on Blood Tests to Determine Paternity (*the Act*), 42 Pa.C.S.A. §§ 6131–37 (effective June 27, 1978) "relaxed" the presumption "to some extent," *id.,* 377 Pa.Superior Ct. at 76, 546 A.2d at 1165, and therefore established "good cause" as a matter of law for an alleged biological father to compel the "presumptive father," *i.e.* the husband, to submit to blood tests.

Superior Court's reasoning was: (1) an alleged biological "unwed" father has procedural and substantive rights to due process and equal protection of laws, and must be afforded the same opportunity to litigate his assertion of paternity of a child as anyone else; and (2) appellee herein could *only* rebut the presumption by clear and convincing scientific evidence (blood tests) establishing that appellant-husband was not the biological father. 377 Pa.Super. at 80–83, 546 A.2d at 1167–68. Thus, Superior Court conducted the "good cause" balance of interests differently than did the trial court in concluding that, when appellee's "need for the information which can only be supplied by testing is

balanced against a party defendant's right of privacy, the scales weigh heavily in favor of court ordered testing." 377 Pa.Super. at 82, 546 A.2d at 1168.

The Superior Court over-emphasized the extent to which the Act "relaxes" the presumption of the husband's paternity, and gave minimal consideration not only to appellant-husband's right to privacy, but also to the Commonwealth's interests as expressed in and protected by said presumption.

It is true that the Act relaxes the presumption "to some extent" for it explicitly provides that the presumption "is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child." 42 Pa.C.S.A. § 6137. *Nixon v. Nixon*, 354 Pa.Super. 232, 511 A.2d 847 (1986). However, the Act does not relax the presumption to the extent that a "putative father," a third party who stands outside the marital relationship and attempts to establish paternity over a child born to the marriage, may compel the "presumptive father," the husband, to submit to blood tests on the strength of such evidence as has been presented herein.

Indeed, section 6133 of the Act does not give the putative father the *right* to compel a presumptive father (husband) to submit to blood tests. That section provides: "In any matter ... in which paternity ... of a child is a relevant fact, the court ... upon motion of any party ... shall order the mother, child *and alleged father* to submit to blood tests." 42 Pa.C.S.A. § 6133. Superior Court has previously interpreted section 6133 as affording no right to an "alleged father" in appellee's situation to compel a "presumptive" father-husband to submit to a blood test. *Burston v. Dodson, supra* at 11, n. 10, 390 A.2d at 220, n. 10.

If appellee's "right" to compel the presumptive father to submit to blood tests cannot be found in the Act, where can it be found? The Superior Court gleaned such right from those cases holding that an unwed father has procedural and substantive due process rights and cannot be denied

access to the courts to prove or disprove his paternity or to assert his interests as a parent. 377 Pa.Super. at 80, 546 A.2d at 1167 (*see* cases cited therein). It is true, of course, that an alleged or unwed father has such rights and that the state cannot deny them. *See, e.g., Adoption of Walker*, 468 Pa. 165, 360 A.2d 603 (1976); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The lower court did not, however, deny appellee any such rights in this case.

The Superior Court over-emphasized the rights and interests of the alleged father and minimized the rights and interests of others involved in and affected by its decision, namely the mother, her husband, the family unit and the Commonwealth. When we factor in those rights and interests, we find that the scales weigh heavily in this case in favor of appellants and against court-ordered blood tests.

With the possible exception of compelling appellant-husband to submit to blood tests, appellee has had every opportunity to present his case and to question the paternity of the Child in a full and fair proceeding. When considering appellee's need for such evidence, we must place its potential evidentiary value in context of all the rest of the evidence, and we must remain mindful that such blood tests are not conclusive, but are merely some (although sometimes, perhaps, very important) evidence of paternity. *Smith v. Shaffer*, 511 Pa. 421, 515 A.2d 527, 529 (1986) (99.99% probability of paternity not conclusive), *and see* Superior Court cases cited therein with approval.

The right of any person to question paternity is not without limitation, and must be considered along with the rights of the person whose blood sample is sought. *Adoption of Young*, 469 Pa. 141, 148, 364 A.2d 1307 (1976). The right of privacy of each individual is protected by the Constitutions of the United States and by this Commonwealth. *See, e.g., Boettger v. Loverro*, 521 Pa. 366, 555 A.2d 1234 (1989); *Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29 (1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Lunderstat v. Pennsylvania*

*House of Representatives Select Committee,* 513 Pa. 236, 519 A.2d 408 (1986); *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983). Of course, an individual's right to privacy is not absolute; however, where a person asserts a legitimate expectation of privacy, that expectation of privacy cannot be violated without a judicial balancing of respective interests and a judicial determination that the government or other private party has compelling needs and interests which justify the invasion of privacy. *See, e.g., Commonwealth v. Sell, supra; Denoncourt v. Commonwealth, State Ethics Commission,* 504 Pa. 191, 470 A.2d 945 (1983); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979); *In re 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 415 A.2d 73 (1980); *Commonwealth v. Hayes,* 489 Pa. 419, 414 A.2d 318 (1980); *Vogel v. W.T. Grant Co.* 458 Pa. 124, 327 A.2d 133 (1974).

 The person whose blood is sought has clear privacy interests in preserving his or her bodily integrity, and the constitutional right to be free from unreasonable searches and seizures. *See, e.g., Koleski v. Park,* 363 Pa.Super. 22, 525 A.2d 405 (1987); *Burston v. Dodson, supra; Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). While the rights and interests of a person whose blood sample is sought are also not absolute, neither are they insubstantial, and they must be taken into consideration by a court in determining whether there is "good cause" for court-ordered blood tests under Rule 4010(a).

There are other interests at stake in this case besides those of appellant-husband and appellee-putative father. Obviously, the needs and interests of the Child are of paramount concern, and the needs and interests of appellant-wife/mother are on a par with the "putative" and "presumptive" fathers. There is, in short, a family involved here. A woman and a man who have married and lived together as husband and wife, giving birth to and raising four children, have obvious interests in protecting their family from the unwanted intrusions of outsiders (even

ones who have had serious relationships with the mother, father or children). The Commonwealth recognizes and seeks to protect this basic and foundational unit of society, the family, by the presumption that a child born to a woman while she is married is a child of the marriage. *Commonwealth ex rel. O'Brien v. O'Brien, supra.*

We see the Commonwealth/family interests highlighted by the "estoppel" cases. In these cases, it is recognized that, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as father of the child. The classic example of this principle is where a man who has lived with a woman and her children for a number of years and has held himself to the world as the father of said children, may be estopped from seeking court-ordered blood tests in a belated attempt to deny paternity. *Commonwealth ex rel. Weston v. Weston,* 201 Pa.Super. 554, 193 A.2d 782 (1963), cited with approval in *Adoption of Young, supra* at 469 Pa. at 148–49, 364 A.2d 1307. These estoppel cases indicate that where the principle is operative, blood tests may well be *irrelevant,* for the law will not permit a person in these situations to challenge the status which he or she has previously accepted. *See, e.g., Commonwealth ex rel. Palchinski v. Palchinski,* 253 Pa.Super. 171, 384 A.2d 1285 (1978); *Commonwealth ex rel. Gonzalez v. Andreas,* 245 Pa.Super. 307, 369 A.2d 416 (1976).

The General Assembly has codified the principle of "paternity by estoppel" in its Act of June 17, 1971, P.L. 175, No. 17, § 1, *as amended* by Act of November 26, 1978, P.L. 1216, No. 288 § 1, 48 Pa.Stat.Ann. § 167 (Purdon's Supp. 1989) (hereinafter referred to as "section 167"), which provides:

**Children; legitimacy; determination of paternity**

(a) Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, That all children shall be legitimate irrespective of the marital status of their parents

and in any and every case where children are born out of wedlock they shall enjoy all the rights and privileges as if they had been born during the wedlock of such parents, except as otherwise provided in Title 20 Pa.C.S.

(b) For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

(1) If the parents of a child born out of wedlock shall have married each other.

(2) *If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds the child out to be his and provides support for the child which shall be determined by clear and convincing evidence.*

(3) If there is clear and convincing evidence that the man was the father of the child which may include a prior court determination of paternity.

*See also* 20 Pa.C.S.A. § 2107(c)(2).

The Superior Court has applied section 167(b)(2) to preclude a father from introducing blood tests to disprove paternity where that father was designated as the child's father on the birth certificate, father and mother were subsequently married, lived together as a family and had another child, and father did not contest the child's paternity until five years after his birth when the couple was separated. *In re Montenegro,* 365 Pa.Super. 98, 528 A.2d 1381 (1987). In that case, the Superior Court stated that, even though the blood tests demonstrated the appellant therein was not the biological father, that finding "is a nullity and provides no basis upon which the father can deny paternity...." *Id.,* 365 Pa.Superior Ct. at 103, 528 A.2d at 1382. Superior Court read section 167 as providing:

a strong policy statement by the legislature that children shall be legitimate, and when putative fathers hold themselves out to be the father of the child, by marrying the mother and assuming responsibility for the care of the child ... paternity is thereby determined ... Since the

requirements of the law had been met to establish pater-
nity, the father was estopped from denying paternity five
years later. *Evidence of the blood tests, therefore, was
inadmissible to disprove paternity for any purpose.*
*Id.,* 365 Pa.Superior Ct. at 104, 528 A.2d at 1384 (emphasis
added).

In the case most analogous to the case at bar, the
estoppel principle was applied in *Adoption of Young*, 469
Pa. 141, 364 A.2d 1307 (1976), to bar the mother from
questioning the paternity of her son. In *Young*, the mother
of the child (the former Mrs. Young), and her second
husband filed a petition seeking to involuntarily terminate
the parental rights of Mr. Young. Mr. Young, the first
husband, was married to the mother when she gave birth to
the child, lived with the mother and child for five months
thereafter, and then financially supported the child and
treated him as his son. The petition to terminate claimed
that the former Mrs. Young (mother of the child) and her
second husband had been having frequent sexual inter-
course at the time of conception, alleged that the second
husband was the father, and requested the court to order
Mr. Young to submit to blood tests. This Court held:

> Prior appellate case law reviewing authorization of court-
> ordered blood tests under the 1961 Uniform Act ... has
> dealt with situations where husbands seeking to avoid
> support obligations by denying paternity petitioned for
> the taking of blood grouping tests. We believe the
> Superior Court's decisions in the [estoppel cases] however
> are applicable to [appellant-mother's] present appeal.
>
> \* \* \* \* \* \*
>
> Were the situation reversed and appellee Young to an-
> swer today in a proceeding against him seeking to en-
> force support payments for the minor child ... there is no
> doubt that the doctrine of estoppel would prevent his
> belated questioning of paternity.
>
> ... The doctrine of collateral estoppel most certainly acts
> to bar appellant [-mother's] present action questioning the
> paternity of her son.

469 Pa. at 150–52, 364 A.2d 1307. *See also Seger v. Seger,* 377 Pa.Super. 391, 547 A.2d 424 (1988).

These estoppel cases are not precisely on point, for it does not seem that appellee herein took any action through the years that was inconsistent with his assertion that he is the biological father of the child in question. However, the presumption that a child born to a married woman is a child of the marriage is as strong a legal precept as is the principle of "paternity by estoppel," especially under all of the circumstances presented herein which only go to buttress that presumption. The Commonwealth is certainly able to recognize this presumption, and has substantial interests in preserving the rights, obligations and other consequences flowing from said presumption. *See Michael H. v. Gerald D.,* — U.S. ——, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).

It is clear, therefore, that the trial court was correct in finding that no good cause existed to compel appellant-husband to submit to a blood test to "establish" paternity. In the eyes of the law, paternity had already been established by the presumption that the Child is the child of the marriage of Paula and Michael T., *Commonwealth ex rel. O'Brien v. O'Brien, supra* at 390 Pa. 555, 136 A.2d 451, and appellee has offered "not one iota of evidence" that is adequate in law to shake that presumption. In law and in fact, *appellant-husband Michael T. is the Child's father,* and no one can henceforth dispute or challenge that fact.

Order of the Superior Court is reversed; the Order of the Court of Common Pleas of Delaware County is hereby reinstated.

NIX, C.J., joins this opinion of the court and files a concurring opinion.

FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ., join in this opinion and the concurring opinion of NIX, C.J.

NIX, Chief Justice, concurring.

I join in the opinion and result of the majority. I write separately to emphasize that this Court has not swayed from the presumption that a child born to a married couple is presumed to be a "child of the marriage."

■ Irrespective of the legal title given this presumption (whether it be "presumption of legitimacy" or the presumption that the child born is the "child of the marriage"), it should remain clear that a child born to a married couple will be presumed to be the issue of the husband. That presumption can be overcome only by proof of facts establishing non-access or impotency. *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951). It continues to be one of the strongest presumptions within our law. *Commonwealth ex rel. Leider v. Leider*, 434 Pa. 293, 254 A.2d 306 (1969); *Cairgle, supra; Commonwealth, ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 136 A.2d 451 (1958).

In this case a third party disputes the paternity of the husband and asks the court to compel the presumed father to submit to a blood test in order to determine who is more likely the father. The lower court properly denied the request, relying upon the "presumption of legitimacy". However, the Superior Court found that the Uniform Act on Blood Tests to Determine Paternity ("the Act"), 42 Pa.C.S. §§ 6131–37, relaxed the presumption, therefore enabling the alleged putative father to establish "good cause" to compel a blood test of the husband under Pa.R.Civ.P. 4010(a).

The Superior Court erred for the presumption is absolute. The Act does not relax the presumption that a child born to a marriage is a "child of the marriage"; it merely provides a mechanism through which an *alleged* father can accumulate evidence of paternity. This Act cannot be used by a third party, seeking to rebut the presumption, to compel a *presumed* father to submit to a blood test. Whatever interests the putative father may claim, they pale in comparison to the overriding interests of the presumed father,

the marital institution and the interests of this Commonwealth in the family unit. These interests are the cornerstone of the age-old presumption and remain protected by the Commonwealth today.

■ Thus a third party who stands outside the marital relationship should not be allowed, for any purpose, to challenge the husband's claim of parentage. I believe the presumption in this situation is irrebuttable and conclusive, the statutory provision cited in the majority opinion notwithstanding. The thrust of the presumption is to establish Michael T. as the legally recognized father of the child in question, without regard to the legitimacy of its biological premise.[1]

FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ., join in this concurring opinion.

---

1. It would also follow that appellee is not entitled to *compel* either the *mother* or the child to undergo testing.